Per Curiam :
On April 7, 1961, 153 Ct. Cl. 170, this court entered judgment for plaintiff and remanded the case to Trial Commissioner Mastín G. White under Rule 38(c) to determine the amount plaintiff is entitled to recover. The commissioner has done so in- a supplemental report filed March 7, 1962. Briefs were filed by both parties. Exceptions to the commissioner’s findings were taken by both parties and the *676 case was submitted to the court on oral argument by counsel. Since the court is in agreement with the supplemental findings and recommendations of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is therefore entitled to recover the sum of three hundred fourteen thousand five hundred two dollars and seventy-four cents ($314,502.74) and judgment will be entered accordingly.
SUPPLEMENTAL OPINION OE COMMISSIONER

Introduction

In connection with the construction of a 26.2-mile levee, known as Levee L-40, in the Everglades region of Florida under a contract with the Corps of Engineers, the plaintiff was paid at the specified unit prices for 1,039,599 cubic yards of “Excavation, unclassified” (Item No. 1), and for 3,230,436 cubic yards of “Embankment” (Item No. 2.). The plaintiff contended in prior proceedings before- this court that it placed additional “Embankment” for which it should have been paid by the Corps of Engineers. The court, in a decision dated April 7, 1961, 153 Ct. Cl. 170, upheld the plaintiff’s contention, and remanded the case to the trial commissioner under Rule 38(c) for a determination regarding the amount of the additional “Embankment” placed by the plaintiff for which it should be compensated.
It was necessary to hold a further 3-day trial as part of' the proceedings under Rule 38(c).
The contract in question covered the construction of 26.2 miles of continuous levee, running generally from north to south. For the purpose of computing the compensation due the plaintiff, the contract divided the levee into two sections, a northern section slightly more than 2 miles in length and a southern section slightly more than 24 miles in length. Only the southern section is involved in the controversy between the plaintiff and the Government.
Both the plaintiff and the Corps of Engineers, at the time when they entered into the contract that is involved in the present litigation, were experienced in levee-construction work within the Everglades region of Florida, and they were generally familiar with the conditions that would be en *677 countered during the course of constructing Levee L-40. Both were aware tbat tbe levee was to traverse a low, flat, wet area; that the surface of the area was characterized by a varied assortment of vegetation, including sawgrass, brush, small trees, and cypress stumps; that beneath the surface vegetation there was a layer of peat; that the layer of peat was more than 4 feet thick at some places; that peat is a compressible and rather unstable soil; and that, beneath the peat, there was a mixture of sand, shell, and conglomerate rock. The parties contracted with each other in the light of this knowledge that was common to both of them.

Material Left on the Berm

Levee L-40 was constructed with material excavated from a continuous borrow pit running along the west side of, and parallel to, the levee. The borrow pit was separated from the levee by a 40-foot strip of land, known as the berm.
Extensive use was made of the berm by the plaintiff, by the plaintiff’s suppliers, and by the Corps of Engineers during the construction of Levee L-40. In the first place, the plaintiff’s three large draglines — which, working in tandem, transferred material from the borrow pit to the levee— rested wholly or partially on the berm while excavating material from the borrow pit and adding it to the levee embankment ; and then they moved along the berm in changing locations. Also, the berm was used as a roadway by tractors, bulldozers, trucks, jeeps, and other vehicles.
In order to prepare the berm for use by equipment of the sort referred to in the preceding paragraph, the berm was first cleared of brush, small trees, stumps, etc. Then, because the peat surface of the berm was compressible and rather unstable, the plaintiff excavated sand, shell, and rock from the borrow pit and spread such material over the peat surface of the berm in order to provide a sufficiently stable surface for the passage of the equipment previously mentioned. Thereafter, at a comparatively late stage in the process of constructing the levee, some — but not all — of the sand, shell, and rock which had been spread over the peat surface of the berm was recovered by the plaintiff and used in completing the levee embankment to the required specifi *678 cations. One of the problems before the court in the proceedings under Eule 38(c) is to determine how much of the sand, shell, and rock from the borrow pit was ultimately-left on the southern section of the berm at the conclusion of the construction process and was never used as part of the levee embankment.
Several persons who were present at the time when Levee L-40 was being constructed and who observed the plaintiff’s operations in spreading sand, shell, and rock from the borrow pit over the peat surface of the berm, and later in recovering some of this material for inclusion in the levee embankment, made estimates at the trial with respect to the quantity of this material that was finally left on the southern section of the berm. There was a wide variance in these estimates, ranging from a low of about 10,000 cubic yards to a high of approximately 375,000 cubic yards.
In view of the wide variance in the estimates based on personal observations, as outlined in the preceding paragraph, I believe that the most reliable estimate regarding the amount of the material from the borrow pit that was finally left on the berm is to be derived from the results of an investigation which the Corps of Engineers made in preparation for the trial sessions under Rule 38 (c). During the course of that investigation, which was made in the summer of 1961, trenches were cut across the 40-foot width of the berm at 1-mile intervals. Twenty-five such trenches were cut in the 24-mile length of the southern section of the berm. The sites for the trenches were selected in relation to the locations of control monuments that had been established before the contract for the construction of Levee L-40 was entered into between the plaintiff and the Corps of Engineers. Within each trench, measurements were made to determine the average thickness of the material overlaying the original peat surface of the berm along the 40-foot length of the particular trench; and the 25 averages thus calculated were, in turn, used as a basis for computing an overall average. The last figure mentioned was then used as representing the average thickness of the material overlaying the original peat surface of the berm throughout the entire 24-mile length of the southern section of the berm, and, on that basis, it appeared that such material totaled 274,787 cubic yards in the summer of 1961.
*679 If it is argued — and the plaintiff does argue — that a sampling from 25 trenches cut at 1-mile intervals is not adequate to provide truly accurate data respecting the situation that prevailed throughout the 24-mile length of the southern section of the berm, the answer must necessarily be that the figures derived from the trenching operation are, in any event, the most objective and reliable evidence that is available to the court. In making a determination on a disputed factual issue, this court, like a jury, must exercise its best judgment on the basis of whatever evidence the parties have provided. United States v. Smith, 94 U.S. 214, 219 (1876).
The evidence indicates that, during the period of approximately 9y2 years between the completion of the levee near the end of 1952 and the 1961 investigation of the berm by the Corps of Engineers, there was some erosion of material from the levee onto the berm. However, it does not appear that such erosion was of sufficient magnitude to affect substantially the validity of the figures derived from the 1961 investigation. Moreover, it seems reasonable to infer that there was probably an offsetting factor in the erosion of material from the berm into the borrow pit during the same 9%-year period.
It is my opinion, therefore, that the court should adopt the figure of 274,787 cubic yards as representing the amount of material from the borrow pit that was finally left on the 24-mile southern section of the berm at the conclusion of the work under the contract for the construction of Levee L-40.

Embankment

As the first step in the process of constructing Levee L-40, it was necessary that the surface of the borrow pit and the base of the prospective levee be stripped of all vegetation, including stumps and roots. Next, wherever in the southern section of the borrow pit the layer of peat was more than 4 feet thick, the plaintiff removed peat from the borrow pit down to the point where the peat remaining in the borrow pit was 3 feet thick, and the excess peat so removed was wasted or discarded. After that, the peat remaining in the borrow pit was mixed with the underlying sand, shell, and rock to provide the material for the construction of the *680 levee. Before being used as part of the levee, the rock in the borrow pit was blasted or broken so that not more than 5 percent of the rock placed in the levee would have a dimension greater than 2 feet. The mixture of peat, sand, shell, and broken rock from the borrow pit was piled on the original peat surface of the levee base in the process of constructing the levee embankment.
In preparing the southern section of the berm for use as a roadway and in constructing the southern section of Levee L-40, the plaintiff excavated from the borrow pit a grand total of 4,798,058 cubic yards of peat, sand, shell, and rock. By deducting from this grand total the 274,787 cubic yards of material from the borrow pit that was finally left on the berm in the southern section, we ascertain that 4,523,271 cubic yards of material from the borrow pit was placed in the southern section of the levee. The plaintiff concedes that the southern section of the levee was overbuilt, beyond the tolerance provided for in the contract, to the extent of 99,005 cubic yards. After deducting the amount of the overbuilding from the 4,523,271 cubic yards of material from the borrow pit that went into the southern section of the levee, we have a remainder of 4,424,266 cubic yards of material, and the principal question before the court is whether this entire quantity was compensable “Embankment.”
All the material which the plaintiff took from the borrow pit and incorporated in the levee was embankment, as that term is ordinarily understood in the construction industry. However, the parties to the present litigation had specifically agreed in the contract for the construction of Levee L-40 that the plaintiff’s compensation for the placement of “Embankment” in the southern section of the levee would be calculated on the basis of measurements made of the material in place as 1,000-foot segments of the levee were completed. Although, for reasons that were discussed in the previous opinion, it was not feasible to carry out the provision of the contract with respect to the measurement of the levee embankment in place, we must not lose sight of the fact that the Corps of Engineers expected to pay for, and the plaintiff expected to be paid for, only that quantity of material that was in place and measurable within the levee embankment as 1,000-foot segments of the levee were completed.
*681 For example, both the plaintiff and the Corps of Engineers were aware of the fact that the peat base beneath the levee embankment was compressible and unstable, and that these characteristics of the peat base would have some effect on the quantity of material that would comprise the levee embankment and be susceptible of measurement upon the completion of 1,000-foot segments of the levee. Although the plaintiff and the Corps of Engineers expected (mistakenly, as it turned out) that the peat base of the levee embankment would, in the main, preserve its integrity as a base and thus be available as a starting point for the measurement of the levee embankment in place when the time came to compute the amount due the plaintiff,[1] both parties anticipated that the peat base would subside to some extent, at least, beneath the great weight of the added material in the embankment, and that, as a consequence of the subsidence, some of the material that had been placed in constructing the levee would be lost for measurement purposes. Even the plaintiff concedes that it anticipated, or reasonably should have anticipated, a loss for measurement purposes of 3 percent of the material added to the levee embankment due to the subsidence of the peat base. Therefore, there can be no serious attack from the plaintiff on the fairness of deducting 3 percent of the 4,424,266 cubic yards previously mentioned, in order to give effect to the understanding of the parties with respect to the prospective loss of embankment material for payment purposes due to the anticipated subsidence of the peat base. This would reduce the compensable embankment in the southern section of the levee to 4,291,538 cubic yards.
In addition, both parties knew, or reasonably should have known, that when the peat in the borrow pit was mixed with the underlying sand, shell, and rock and the mixture was added to the levee embankment, the peat as part of the levee embankment would be compressed to about 50 percent of the space that it had occupied in its natural state, and that *682 this factor of the compressibility of the peat portion of the levee embankment would affect the measurable amount of embankment at the time when 1,000-foot segments of the levee in the southern section were measured for payment purposes. It appears that approximately 16 percent of the 4,291,538 cubic yards of material now under consideration consisted of peat. Hence, the amount of the peat that is involved in the present calculation totaled about 686,646 cubic yards. Since the peat was compressible to the extent of about 50 percent as part of the levee embankment, it reasonably should have been anticipated by both parties that the 686,646 cubic yards of peat would be compressed to about 343,323 cubic yards as of the time when the 1,000-foot segments of the completed levee were measured for payment purposes. When this anticipated loss of material for measurement purposes is taken into account, there remains a net of 3,948,215 cubic yards of compensable embankment for which the plaintiff was entitled to compensation.
Expert witnesses for the plaintiff expressed the opinion that the sand, shell, and broken rock that were taken from the borrow pit and used as part of the levee embankment probably underwent a net bulking or expansion as a result of being taken from their natural location and placed in a new combination as part of the levee embankment. On the other hand, expert witnesses for the Government expressed the opinion that such material probably underwent a net contraction as a result of the changes in location and combination. In view of this difference of opinion among the experts, it is my belief that no adjustment should be made on account of the expansion or contraction of the sand, shell, and rock. Although it seems reasonable to suppose that broken rock is ordinarily more bulky than solid rock, the voids between the pieces of rock in the levee embankment were undoubtedly filled with sand and other material, so that, in their totality, the sand, shell, and rock probably occupied about the same amount of space in the levee embankment that they had occupied in the borrow pit.
The Corps of Engineers paid the plaintiff for 3,230,436 cubic yards of embankment in connection with the construction of the southern section of the levee. As indicated earlier *683 in this part of the supplemental opinion, it is my view that the compensable embankment in the southern-section of the levee actually totaled 3,948,215 cubic yards. Therefore, it appears that the plaintiff is entitled to be paid for 717,779 cubic yards of additional embankment at the unit price of $0,422, or a total of $302,902.74.

Liquidated Damages

The plaintiff was required to commence work on Levee L-40 Avithin 30 calendar days after receiving the notice to proceed, and it was required to prosecute the work at an average rate per month of not less than 375,000 cubic yards. Liquidated damages at the rate of $200 per calendar day were assessable for delay in completing the work under the contract.
The plaintiff received the notice to proceed on June 22, 1951, and this fixed July 22, 1951, as the date on which the plaintiff was required to commence work under the contract. The work was completed by the plaintiff and accepted by the Corps of Engineers on December 29, 1952.
The Corps of Engineers concluded that July 4,1952, was the date on which the plaintiff was required to complete all the work under the contract. Accordingly, the Corps of Engineers assessed against the plaintiff liquidated damages at the contract rate of $200 per day for 178 days of delay from July 5 to December 29, 1952, or a total of $35,600.
The time fixed under the contract for the completion of Levee L-40 was to be calculated on the basis of the total number of cubic yards of compensable “Excavation, unclassified” (Item No. 1) and the total number of cubic yards of compensable “Embankment” (Item No. 2). The parties are in agreement that there were 1,039,599 cubic yards of com-pensable “Excavation, unclassified.” As indicated in an earlier portion of this supplemental report, it is my opinion that there were 3,948,215 cubic yards of compensable “Embankment.” Hence, it is my view that the amount of time allowed by the contract for the completion of Levee L-40 should be calculated on the basis of a grand total of 4,987,814 cubic yards of “Excavation, unclassified” and “Embankment.” The contract prescribed 375,000 cubic yards per *684 month, as the standard of accomplishment. On that basis, the contract allowed the plaintiff 13 months and 9-plus-a-fraction days for the completion of Levee L-40, and fixed August 31, 1952, as the final day on which the work should have been completed.
As stated earlier in this part of the supplemental opinion, the work under the contract for the construction of Levee L-40 was not completed by the plaintiff until December 29, 1952. Therefore, the plaintiff was chargeable with 120 days of delay. At the rate of $200 per day of delay prescribed in the contract for the assessment of liquidated damages, it appears that the Corps of Engineers was authorized to assess a total of $24,000 against the plaintiff as liquidated damages on account of delay in completing the contract.
Since the Corps of Engineers actually assessed $35,600 against the plaintiff as liquidated damages for delay, there was an overcharge of $11,600. The plaintiff is entitled to the latter sum as part of the judgment in the present litigation.

Conclusion

For the reasons indicated heretofore in the supplemental report, it is my opinion that the plaintiff is entitled to recover $302,902.74 as compensation for additional embankment in connection with the construction of the southern section of Levee L-40, and to recover $11,600 representing an overcharge of liquidated damages, or a total of $314,502.74.
ADDITIONAL FINDINGS OF FACT
25. At the time when the plaintiff and the Corps of Engineers entered into the contract that is involved in the present litigation, they were both experienced in levee-construction work within the Everglades region of Florida, and they were generally familiar with the conditions that would be encountered during the course of constructing Levee L-40. Both were aware that the levee was to traverse a low, flat, wet area; that the surface of the area was characterized by a varied assortment of vegetation, including sawgrass, brush, small trees, and cypress stumps; that beneath the surface vegetation there was a layer of peat; that the layer *685 of peat was more than 4 feet thick at some places; that peat is a compressible and rather unstable soil; and that beneath the peat there was a mixture of sand, shell, and conglomerate rock.
26. Extensive use was made of the berm by the plaintiff, by the plaintiff’s suppliers, and by the Corps of Engineers during the construction of Levee L-40. The plaintiff’s large draglines — which, working in tandem, transferred material from the borrow pit to the levee — rested wholly or partially on the berm while excavating material from the borrow pit and adding it to the levee embankment; and then they moved along the berm in changing locations. In addition, the berm was used as a roadway by tractors, bulldozers, trucks, jeeps, and other vehicles.
27. In order to prepare the berm for use by equipment of the sort mentioned in finding 26, the berm was first cleared of brush, small trees, stumps, and other surface vegetation. Then, because the peat surface of the berm was compressible and rather unstable, the plaintiff excavated sand, shell, and rock from the borrow pit and spread such material over the peat surface of the berm in order to provide a sufficiently stable surface for the passage of the equipment referred to in finding 26. Thereafter, at a comparatively late stage in the process of constructing the levee, some — but not all — of the sand, shell, and rock which had been spread over the peat surface of the berm was recovered by the plaintiff and used in completing the levee embankment to the required specifications.
28. A total of 274,787 cubic yards of material from the borrow pit was finally left on the 24-mile southern section of the berm at the conclusion of the work under the contract for the construction of Levee L-40.
29. A total of 4,523,271 cubic yards of material from the borrow pit was placed in the southern section of Levee L-40. Of this total, 99,005 cubic yards represented overbuilding beyond the tolerance provided for in the contract. Hence, the plaintiff placed 4,424,266 cubic yards of material from the borrow pit in completing the southern section of Levee L-40 to the specifications prescribed in the contract.
30. At the time when the parties entered into the contract *686 for the construction of Levee L-40, the plaintiff and the Corps of Engineers anticipated, or reasonably should have anticipated, that the peat base beneath the levee embankment in the southern section of Levee L-40 would subside to some extent beneath the great weight of the added material in the embankment, and that, as a consequence of the subsidence, at least 3 percent of the material added to the levee embankment would be lost for measurement purposes as of the time when the plaintiff’s compensation for constructing the southern section of Levee L-40 was computed.
31. When the plaintiff and the Corps of Engineers contracted for the construction of Levee L-40, both parties knew, or reasonably should have known, that when the peat in the borrow pit was mixed with the underlying sand, shell, and rock and the mixture was added to the levee embankment, the peat as part of the levee embankment would be compressed to about 50 percent of the space that it had occupied in the borrow pit, and that this factor of the compressibility of the peat portion of the levee embankment would affect the measurable amount of embankment at the time when the plaintiff’s compensation for constructing the southern section of Levee L-40 was computed.
32. Approximately. 16 percent of the material that was taken from the borrow pit and used in constructing the southern section of Levee L-40 consisted of peat.
33. In their totality, the sand, shell, and rock that were taken from the borrow pit and used in constructing the southern section of Levee L-40 occupied approximately the same amount of space in the levee embankment that they had occupied in the borrow pit.
34. The plaintiff was entitled to compensation for a total of 3,948,215 cubic yards of embankment in connection with the construction of the southern section of Levee L-40. As the plaintiff was paid for only 3,230,436 cubic yards of embankment, it is entitled at the present time to be paid for 717,779 cubic yards of additional embankment.
35. (a) The final date-fixed by the contract for the completion of Levee L-40 was August 31, 1952, in relation to 1,039,599 cubic yards of compensable “Excavation, unclassified” and 3,948,215 cubic yards of compensable “Embank *687 ment.” As the plaintiff did not complete the construction of Levee L-40 until December 29,1952, the plaintiff was chargeable with 120 days of delay, and liquidated damages in the total amount of $24,000 were assessable against the plaintiff by the Corps of Engineers.
(b) As the Corps of Engineers assessed $35,600 against the plaintiff as liquidated damages for delay in completing the construction of Levee L-40, there was an overcharge of $11,600.
CONCLUSION OF LAW
' Upon the foregoing findings of fact and those incorporated in the court’s decision of April 7,1961, all of which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is there-: fore adjudged and ordered that the plaintiff recover of and from the United States the sum of three hundred fourteen thousand five hundred two dollars and seventy-four' cents ($314,502.74).

 Tlie contract specifically provided, with respect to the plaintiff’s compensation for the construction of the southern section of Levee LIO, that “Measurements of quantities to be paid for will be made by computing the volume between the ground surface existing after stripping of levee base is completed, and the specified construction cross-section.”