**PHILLIPS CONSTRUCTION CO., Inc.**

v.

**The UNITED STATES.**

No. 334–63.

United States Court of Claims.

May 10, 1968.

James H. Mann, Washington, D. C., for plaintiff. H. Haywood Robbins, Charlotte, N. C., attorney of record. Scott W. Lucas, Friedman & Mann, Washington, D. C., of counsel.

Alfred H. O. Boudreau, Jr., Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, DURFEE, DAVIS, COLLINS, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law pursuant to the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on March 21, 1967, wherein the facts necessary to the opinion are stated therein. Exceptions to the commissioner's opinion, findings, and recommended conclusion of law were filed by the defendant and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's findings, opinion, and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Plaintiff is, therefore, entitled to recover and judgment is entered for plaintiff in the sum of $89,000.

## OPINION OF COMMISSIONER

FLETCHER, Commissioner:

The Armed Services Board of Contract Appeals held extensive hearings on this Capehart Housing Contract dispute. Based upon substantial evidence, the Board decided that this plaintiff-contractor had suffered a changed condition for which it was entitled to an equitable adjustment. The inability of the parties to agree amicably on the amount of the adjustment resulted in further hearings. Thereafter, the Board issued a second decision on quantum holding that the amount of plaintiff's equitable adjustment should be $89,000.

Content with the Board's decision on the merits but dissatisfied with its determination of the amount of adjustment, the plaintiff now asks this court to "proceed, realistically, to determine the amount of plaintiff's damages resulting from the changed condition." Its assignment of errors, therefore, has been confined to an attack on those findings of the Board relating to the amount to which plaintiff is equitably entitled.

Striking for the jugular vein, the Government now contends that its Board erred *as a matter of law* in its first decision by finding that a changed condition was encountered. Therefore, says the Government, plaintiff is not entitled to an equitable adjustment at all, much less to $89,000. Not one to place all its eggs in one basket, however, the Government adds that, assuming the existence of a changed condition, the Board's second decision as to the proper amount of an equitable adjustment is fully supported by the evidence before it.

For the reasons stated below, I am of the opinion that, contrary to the Government's present position, the Board's first decision that plaintiff encountered a "changed condition" was a finding of fact rather than the resolution of a question of law. Accordingly, if that finding is supported by substan-

tial evidence (which I believe it to be) it is final and conclusive and, therefore, plaintiff is entitled to an equitable adjustment for the changed condition. I am of the further opinion that the subsequent evidence presented to the Board as to the proper amount of such equitable adjustment will not support a figure in excess of that recommended by the Board in its second decision on quantum. I, therefore, believe that judgment for the plaintiff should be entered here in the sum of $89,000.

The Board made findings of fact which are amply supported by the evidence before it and which may be summarized as follows. As the low bidder for a typical Capehart housing project, plaintiff was awarded a contract under date of October 2, 1957, calling for the construction within 480 days[1] of 800 family housing units adjacent to the Myrtle Beach Air Force Base on the South Carolina coast. As amended, the final contract price was $12,202,842 to be paid from private funds under the usual Capehart financial arrangements with a banking institution.[2] Plaintiff substantially completed its construction work in November 1959, and the Board member who heard the ensuing dispute concluded from photographic evidence that the resulting project was one of the most attractive he had ever seen. It was a complete community composed of many houses with carports. It was well-landscaped and included several miles of paved streets and sidewalks, together with sanitary and storm drainage and utilities.

Plaintiff's completion of the project was not easily come by. Some of the heaviest rainfall in the history of this area seriously impeded plaintiff's construction work, and the Board found that the "quagmire" conditions existing on the site for prolonged periods during construction caused plaintiff to suffer "a considerable loss." Plaintiff has never disputed that it assumed the risks incident to abnormal rainfall as such. But it claimed that its difficulties were greatly compounded by what it considered to be the inadequacy of the Government-designed drainage system for the project. As the Board put it in its first decision:

> While recognizing water would be on the site, the chief complaint of the appellant in this case is that drainage arrangements were insufficient to disperse it. The result was that large areas became flooded where saturation of the ground continued for prolonged periods of time.

There was no dispute that the appellant accomplished work in a quagmire. Whether it was a hog-wallow or a 'Gator-hole, it is certain that workmen wore boots to wade through the mud.

During the hearing, appellant's exhibit No. 4 was used frequently by both parties. It was a drawing of the site and showed the flood areas in red. The red part constituted approximately half of the site and affected all three mortgage areas. The two large flood areas were separated by a slightly elevated ridge in the center of the site. Natural ditches, which the appellant developed into open swales in accordance with the drawings, were approximately in the middle of the large flood areas.

The areas marked in red were flooded many times and the ground was slow to dry out after each flood. A Government witness testified that the water impounded would stay there until the cows drink it or the sun dries it up.

After noting that the soil in the area involved was such that, when saturated with water, it had to be either aerated or replaced, the Board turned its atten-

---

1. By supplemental agreements, this completion time was extended to 766 days.

2. For a description of these typical arrangements, see Miller v. United States, 161 Ct.Cl. 455 (1963), cert. denied 375 U.S. 879, 84 S.Ct. 149, 11 L.Ed.2d 111.

tion to the adequacy of the storm drainage system provided in the Government's drawings. The general scheme was to flow water down street gutters into catch basins, thence *via* underground pipes into on-site swales, and thence into an off-site swale connected with an outfall ditch emptying into the Atlantic Ocean.

The worst situation that faced plaintiff, said the Board, was the clogged condition of the outfall ditch. It was the key to the proper functioning of the drainage system, and when it failed to carry away the excess water, the result was prolonged ponding and flooding back on the construction site. Plaintiff was not able itself to correct this situation because the outfall ditch was located on contiguous private land not owned by the Government. However, on plaintiff's complaints, the Government undertook to rectify the condition. It obtained permission from the private owner to enter his property and awarded a contract to another contractor for the cleaning out of the outfall ditch over its entire length of 4,175 feet. This work was not completed until around 12 to 13 months after plaintiff had begun its construction work on the housing project.

In addition to the defective outfall ditch, the Board found that the piping specified by the drainage system drawings was inadequate. As a result, debris would clog the pipes and cause flooding, a condition which was not alleviated by the Government until long after the plaintiff had finished its work on the project.[3]

In its consideration of the drawings and specifications the Board noted that they appeared to cover an ordinary construction job. There was nothing to put a bidder on notice that drainage of the area might become a major problem or that the specified drainage system might prove to be inadequate. In answer to the Government's contention

that plaintiff, by its pre-bid inspection, was charged with knowing the site conditions, the Board said:

The evidence is clear that nine people visited the site who gave information to the appellant before its bid was submitted. The soil had good bearing qualities. Two places were wet but the reports were that they could be drained effectively. The Board considers that the appellant could rely on the implied warranty that the drainage prescribed by the Government would be effective.

We do not consider that the contract clause requiring the appellant to visit the site transferred all risks of consequences in this case to the appellant.

Another contention by the Government before the Board (and in this court also) was that rainfall alone caused plaintiff's difficulties and that, since rain is an act of God, it cannot be considered a changed condition. The Board replied, however, that the abnormal rainfall was only one factor and that the failure of the drainage system to disperse the water "was a contributing cause of the quagmire conditions" which qualified as a changed condition within the meaning of Clause 9d(2) of the contract, reading as follows:

(2) previously unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inherent in work of the character provided for in this Housing Contract, which physical conditions either were not, or in the exercise of the care required by other provisions of this contract would not have been, discovered by the eligible builder.

The Board concluded:

\* \* \* Based upon the evidence, the Board has no difficulty in deter-

---

3. The drainage system has never been corrected to the point where it will prevent

ponding and street flooding during heavy rainfall.

mining that the drainage system prescribed in the drawings was inadequate during the construction period causing the large areas of the site marked in red on appellant's exhibit no. 4 to be flooded numerous times during rains and causing the flooded ground to be saturated for prolonged periods. The fact that about half the site would ·be flood area was an unknown physical condition on the site within the meaning of Clause 9d(2) of the contract quoted above.

Accordingly, the Board held that plaintiff was entitled to an equitable adjustment. However, since plaintiff had computed its claim on a total cost basis which necessarily included additional costs in both flooded and nonflooded areas, and since the Board was unable on the evidence before it to segregate costs properly applicable to each, it returned the case to the contracting officer for negotiations with plaintiff as to amount.

Following remand to the contracting officer, the parties tried, but failed, to agree upon the proper amount of equitable adjustment to which plaintiff was entitled. Therefore, to resolve the impasse, the Board scheduled a quantum hearing which was held on September 11–13, 1962. In presenting its case, plaintiff again relied on the total cost approach upon the theory that, under the circumstances, it simply had no other feasible way to demonstrate its losses arising out of the changed condition. It took the position that the only way it could prove its loss was by showing the difference between the amounts it reasonably expected to spend on the basis of its bid estimates for selected items of work and the actual amounts that it was required to spend in performing those items under the changed condition.

To the Board, this approach was unfair to the Government and really amounted to no proof at all because it failed to take into account that muddy conditions in the nonflooded areas (for which the Government was not responsible) materially contributed to plaintiff's overall losses. Accordingly, the Board felt that plaintiff had simply turned over to it the entire problem of establishing the costs properly allocable to the changed condition and that, under such circumstances, it would be justified in simply holding that plaintiff had failed to carry the burden of proof.

Nonetheless, the Board proceeded as best it could to analyze the evidence before it. Essentially, this evidence consisted of its previous record and expert testimony regarding the extent of the flooded *vis-a-vis* the nonflooded areas. Under their interpretation of the Board's original decision on liability, plaintiff's witnesses considered that they were to take into account as "flooded areas" not only those areas actually under water for prolonged periods of time, but also those areas *affected* by the flooded conditions even though not themselves inundated.[4] Under this theory they concluded from their studies that somewhere between 55 to 75 percent of the total area was adversely affected by flood conditions.

The Government experts took a different approach. On the theory that the Board's finding of a changed condition was based not upon the abnormal rainfall (for which no relief was available) but upon the combination of abnormal rainfall with an inadequate drainage system, the Government witnesses concluded that when the Board spoke of "flood areas" and "flooded conditions," it was referring only to areas actually inundated by water standing for prolonged peri-

4. For example, says plaintiff, assume a 25-acre elevated surface which is relatively dry and on which construction work has begun. It is surrounded by a lower surface of acreage entirely inundated by rainwater. In plaintiff's view, the 25-acre tract must be considered part of the flood area because the water surrounding the tract renders it inaccesible. On the evidence before it, however, the Board could not find that the assumed condition had actually occurred an appreciable number of times.

ods. Using contour maps to establish the highest water elevations, together with photographs and observations of Government personnel familiar with the site, these experts estimated that such inundated areas during the period involved would not have exceeded 10.2 percent of the entire site exclusive of the swales.

Plaintiff's expert conceded that, if the term "flooded conditions" was intended to encompass only the areas literally under water, as distinguished from other areas merely affected by such inundation, the Government's computations were reasonably accurate. The Board accepted the Government's interpretation and found:

> Based upon all of the evidence presented * * * we find that the flooded area was approximately 10.2% of the site exclusive of the swales.

Using the 10.2 percentage figure as a guideline, the Board proceeded to determine the dollar amount of the equitable adjustment and arrived at the figure of $89,000. In its opinion the Board did not set forth a mathematical computation adding up to $89,000 but instead likened its decision to a jury verdict.[5] It said:

> * * * Under the facts at hand, we know of no logical approach by which we could step by step with demonstrable accuracy reach a precise figure.
>
> Our judgment is based upon our familiarity with the records in the two cases, our knowledge of legal precedents and the general experience we have gained in deciding from day ·to day matters arising out of construction as well as other types of contracts.

Asserting that such "vague generalities" constituted a clear instance of arbitrary and capricious action, plaintiff rejected the recommended award. It now asks this court to determine "realistically"[6] the true amount of plaintiff's damages suffered from the changed condition.

At the outset, it is necessary to consider defendant's attack upon the Board's holding that a changed condition existed in this case. The argument is that plaintiff's damage resulted from a combination of (1) physical conditions known to plaintiff by reason of its pre-bid inspection of the site and (2) an act of God. These, it is said, as a matter of law, cannot result in a changed condition.

■■ This argument would seem to qualify as an instance of what the Supreme Court has called (in another connection) "a clear case of overkill." Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 579, 85 S.Ct. 1162, 14 L.Ed. 2d 75 (1965). If it were possible to accept defendant's premises (1) and (2) above, then its conclusion that the Board erred as a matter of law would follow, and the decision would have no binding effect. See Flippin Materials Co. v. United States, 312 F.2d 408, 160 Ct.Cl. 357 (1963). However, defendant's premise (1) is in error. The Board considered from the evidence before it that plaintiff had made an adequate pre-bid site investigation, and that nothing in the inspection or in the drawings and specifications would have put plaintiff on notice that drainage of the site would prove to be the major problem that it did. *This constitutes a finding of fact, not a conclusion of law.* It was supported by substantial evidence and hence is final and conclusive. Carlo Bianchi &

---

5. However, using statements and figures contained in the ·opinion and its attachments, the defendant has made a persuasive analysis of the factors which most likely were considered by the Board in arriving at $89,000. Under defendant's reconstruction, the total of the claims which the Board considered allowable, after percentage adjustments to eliminate nonflooded areas, was $89,240.94. Defendant assumes, with probable justification, that the Board simply "rounded off" that figure to $89,000.

6. That is to say, by the "total cost" method.

Co. v. United States, 167 Ct.Cl. 364 (1964), cert. denied, 382 U.S. 841, 86 S.Ct. 32, 15 L.Ed.2d 82 (1965). True, there was evidence before the Board to the contrary, but the court may not displace the Board's choice between two fairly conflicting views, even though the court might justifiably have made a different choice had the matter been before it *de novo*. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); The Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, 177 Ct.Cl. 184, 207 (1966).

Defendant further argues that the Board erred in relying on United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918) to support its view that plaintiff could rely on an implied warranty that the drainage system prescribed by the Government would be effective. The *Spearin* doctrine, says defendant, has applicability only to a breach of contract case (over which the Board has no jurisdiction) and is entirely irrelevant to the question of entitlement to an equitable adjustment for a changed condition. However, from the court's decision in Hol-Gar Manufacturing Corp. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966) it would appear that, in a defective specifications case, the contractor may be entitled to recover on either theory. While recognizing in *Hol-Gar* that the contractor could recover damages for breach of warranty, the court also held that Hol-Gar was "entitled *to an equitable adjustment* which will compensate it for the costs which it incurred in trying to perform in accordance with the original specifications that turned out to be defective." [7] (Emphasis supplied.) Hol-Gar Manu-

facturing Corp. v. United States, supra, at 360 F.2d 638, 175 Ct.Cl. 524.

■ In all events, defendant has failed to upset the Board's finding that, under the combination of circumstances in this case, neither party could have reasonably foreseen that a considerable part of this construction work would have to be performed in a quagmire. This finding was supported by substantial evidence. The fact that there was evidence to the contrary which could have justified the opposite conclusion (see, for example, Banks Construction Co. v. United States, 364 F.2d 357, 176 Ct.Cl. 1302 (1966) involving generally the same area and time period) is of little moment. An administrative determination is not to be tested by the standard of whether the court would reach the same conclusion upon an independent study of the evidence in the record. Accordingly, defendant's assignment of error should be overruled.

The remaining question is whether the Board committed error in its finding that the amount of plaintiff's equitable adjustment should be $89,000. All of plaintiff's assignments of error are directed to this issue upon the underlying theory that the Board was arbitrary and capricious in its refusal to apply the so-called "total cost" method for the computation of plaintiff's damages.[8] The defendant, on the other hand, contends that the Board's quantum findings meet all Wunderlich Act criteria and are, therefore, final and conclusive. I agree with defendant.

As support for its total cost approach, plaintiff, of course, points to the decisions of this court in Great Lakes Dredge & Dock Co. v. United States, 96

---

7. Judge Davis, concurring, however, preferred to rest his concurrence entirely on a special provision in the Hol-Gar contract providing for an equitable adjustment in the event defective specifications necessitated a change, a feature admittedly not present here.

8. As is well-known, this method essentially involves a computation of the amount of

damages or of an equitable adjustment simply by finding the difference between the contractor's original bid estimate and his total costs incurred in performing the contract under the changed condition. For a recent and comprehensive discussion of the theory, see Rubin, The Total Cost Method of Computing an Equitable Adjustment—An Analysis, 26 Fed.B.J. 303 (1966).

F.Supp. 923, 119 Ct.Cl. 504 (1951), cert. denied, 342 U.S. 953, 72 S.Ct. 624, 96 L.Ed. 708 (1952) and Oliver-Finnie Co. v. United States, 279 F.2d 498, 150 Ct.Cl. 189 (1960). Reference could also have been made to the more recent case of J. D. Hedin Construction Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965). All are instances where, for lack of an alternative, the court deemed it necessary to compute the amount of recovery by the total cost method.

However, as plaintiff itself recognizes, this method is not preferred by the court and will be used only in an extreme case. The reasons for its reluctance to apply the total cost approach are explained by the court in a much-quoted excerpt from its opinion in F. H. McGraw & Co. v. United States, 130 F. Supp. 394, 131 Ct.Cl. 501 (1955). The court said:

> This method of proving damage is by no means satisfactory, because, among other things, it assumes plaintiff's costs were reasonable and that plaintiff was not responsible for any increases in cost, and because it assumes plaintiff's bid was accurately computed, which is not always the case, by any means.
>
> Our opinion in Great Lakes Dredge & Dock Co. v. United States, supra, was not intended to give approval to this method of proving damage, except in an extreme case and under proper safeguards. 130 F.Supp. 400, 131 Ct. Cl. 511.

In my judgment, this is not that "extreme case" where the total cost approach represents the only feasible method of computing the amount of an equitable adjustment due the contractor. It is axiomatic, of course, that the determination of such amount is a pure question of fact. United States v. Callahan Walker Constr. Co., 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942). Hence, the Board's determination of the amount must be accepted by the court as final and conclusive if that determination meets the criteria prescribed in the first section of the Wunderlich Act (41 U.S. C. Sec. 321), Morrison-Knudsen Co., Inc. v. United States, 345 F.2d 833, 837, 170 Ct.Cl. 757, 763–764 (1965). I believe that the Board's determination does meet those criteria.

It will be recalled from the statement of facts above that, in its quantum hearing, the Board was confronted with the task of determining what portion of plaintiff's additional cost was properly allocable to the changed condition, i.e., the flooded areas. The most reasonable approach to this problem appeared to be an initial determination of what percentage of the entire area was flooded for prolonged periods. The Government's witnesses estimated that percentage to be 10.2 percent of the project site, and even plaintiff's expert witness could find no fault with that figure under the premise that it related to that part of the area which was actually covered by standing water.[9] That estimate might convince a reasonable person and, therefore, the Board's acceptance of it must be said to have been based on substantial evidence. See River Construction Corp. v. United States, 159 Ct.Cl. 254, 261 (1962) and Camero v. United States, 345 F.2d 798, 800, 170 Ct.Cl. 490, 493–494 (1965).

Plaintiff contends that the arbitrary nature of the Board's determination is clearly demonstrated by the inconsistency between its first and second decisions. In its first decision relating to the question of liability, the Board commented that "about half the site" was flood area, whereas in its second decision relating to the proper amount of an equitable adjustment, the Board deter-

---

9. He, of course, testified that a much larger percentage of the project was *affected* by the flooded conditions, but the Board rejected his percentage on the theory that it made no allowance for the fact that abnormal rainfall for which the Government was not responsible had materially contributed to plaintiff's difficulties.

mined that only 10.2 percent of the site comprised the flood area.

However, plaintiff makes too much of this apparent discrepancy. In its first decision, it must be remembered, the Board's analysis was concentrated on the question of whether a changed condition was encountered and not on the question of the extent of that changed condition. The Board's reference to "about half the site" stemmed from its examination of a contractor's rough exhibit which counsel had stated was introduced only for purposes of illustration and not as an accurate representation.

By contrast, in the second hearing when the question of the extent of the flooded areas had become the most important issue, the parties presented to the Board much more detailed and accurate evidence. In addition, the Board had the benefit of extensive testimony by experts who had given the entire matter their comprehensive study. Under such an expanded record, a substantial variance from an earlier, offhand approximation is hardly unusual and certainly should not be considered arbitrary, especially when, as shown above, the later and more accurate finding is supported by the evidence in the expanded record.

In arriving at the dollar amount of its equitable adjustment, the Board did not fully articulate its computations.[10] A fair analysis of its second opinion, however, is persuasive that, in fact, it applied the 10.2 percentage (rounded out to 11 percent) to plaintiff's drainage claim figures, 42 percent to plaintiff's paving claim figures after eliminating certain disallowed items,[11] and 100 percent of miscellaneous additional paving costs. The total of these computations was very close to the $89,000 recommended by the Board as the equitable adjustment to which plain-

tiff was entitled. This was no fatigue decision. It represented the best judgment of the fact trier on the record before it, and this "is all that the parties have any right to expect." United States v. Smith, 94 U.S. 214, 219, 24 L. Ed. 115 (1876). See, also, Clemens Construction Co. v. United States, 160 Ct.Cl. 675, 679 (1963) and Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 572–573, 174 Ct.Cl. 153, 184 (1966).

For the above reasons, it is my opinion that the Board's determination of $89,000 as the amount of the equitable adjustment due plaintiff is supported by substantial evidence. It is, therefore, final and conclusive under the first section of the Wunderlich Act (41 U.S. C. Sec. 321), without regard to whether the court would reach the same conclusion upon an independent study of the evidence in the administrative record. No part of said $89,000 has as yet been paid plaintiff by the defendant, and since plaintiff is entitled thereto, judgment should be entered for plaintiff in that amount.

10. As noted in the factual summary, the Board felt that from the evidence presented to it there was no way to reach a precise figure "with demonstrable accuracy."

11. The Board had found that "approximately 42% of the streets" were constructed in flooded areas. See p. 18 of the second opinion.