**ELECTRONIC AND MISSILE FACIL-
ITIES, INC.**

v.

**The UNITED STATES.**

**No. 221–67.**

United States Court of Claims.

Oct. 17, 1969.

Max E. Greenberg, New York City, attorney of record, for plaintiff; Harold F. Blasky and Max E. Greenberg, Trayman, Harris Cantor, Reiss & Blasky, New York City, of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with directions to make recommendation for conclusions of law under the order of reference and Rule 99(c) [since September 1, 1969, Rule 166(c)]. The commissioner has done so in an opinion and report filed on June 24, 1969, wherein such facts as are necessary to the opinion are set forth. Neither party filed a request for review of the commissioner's opinion, report and recommendations, pursuant to the provisions of Rules 99(c) and 55(b) (3) [since September 1, 1969, Rules 166(c) and 54 (b) (3)] within the time allowed for such filing under the rules of the court. On August 4, 1969, plaintiff filed a motion that the commissioner's report be adopted by the court without oral argument and on August 8, 1969, defendant filed a response thereto, also requesting adoption of the commissioner's recommendation.

The case has been submitted to the court without oral argument and since the court agrees with the commissioner's opinion and recommended conclusions of law, as hereinafter set forth, it hereby grants plaintiff's motion to adopt and adopts the same as the basis for its judgment in this case. Therefore, plaintiff's motion and defendant's cross-motion for summary judgment are granted in part and denied in part as to plaintiff's first and second causes of action, in accordance with the opinion. Further proceedings pertaining thereto will be suspended in this court for a period of ninety (90) days from this date pursuant to Rule 100 [since September 1, 1969, Rule 167] to afford the parties an opportunity to obtain an administrative resolution of the equitable adjustment to which plaintiff is entitled, with the parties to comply with said rule and the General Order of April 1, 1968, implementing it. As to plaintiff's third cause of action, plaintiff's motion for summary judgment is denied, defendant's cross-motion is granted and the petition is dismissed.

OPINION OF COMMISSIONER

WOOD, Commissioner:

This case is before the court on cross-motions for summary judgment for review, under Wunderlich Act [1] standards, of a 1966 decision of the Armed Services Board of Contract Appeals. ASBCA No.

1.  68 Stat. 81, 41 U.S.C. §§ 321, 322 (1960).

9866, 66–1 BCA ¶ 5307. On a monetary claim totaling some $703,000, and pertaining to nine separate "items," the Board awarded plaintiff an "equitable adjustment" of $174,000. In three counts, plaintiff here seeks an additional $520,-705.91.

The preliminary facts are not in any dispute. On March 1, 1962, plaintiff was awarded an Air Force contract for the construction of 300 armed services housing units at Hill Air Force Base, Utah. Plaintiff received notice to proceed on March 19, 1962.

The terrain on which the housing units were to be built sloped downward in a generally southwesterly direction.[2] As designed, the housing units were to be placed on individual level sites or terraces supported and separated by embankments. Proper grading, therefore, required both cutting (principally in the north and on the upper sides of the streets) and filling (in the south and on the lower sides of the streets).

It was contemplated at the outset that additional fill material, over and above the earth available from the housing site area itself, would be required. Plaintiff and one of its subcontractors (C.M.C. Construction Company) estimated a deficiency of about 24,000 cubic yards, and a subcontract was written on that basis (with a provision for more fill, if required, to be "paid for at the rate of $1.50 per cubic yard, in place and compacted.").

After the clearing of the project area, stripping and stockpiling of topsoil, to a

depth of up to 6 inches, commenced.[3] The project area contained some 45,000 cubic yards of such topsoil. During April and early May 1962, C.M.C. was required to remove and store an additional 15,000 cubic yards of "topsoil."[4] This required the replacement of the removed "topsoil" with 15,000 cubic yards of fill.

"The grading operation was first the cutting of broad sweeps of uniform grade along the lines of houses as they should be constructed, moving the cut material generally to the area where fill was required. The terraces and embankments were then formed and then came excavations for footings, basements and crawl spaces. At the same time borrow material was introduced into the area."

In August 1962, the contracting officer decided that plaintiff was contractually obligated to strip 6 inches of surface soil from all lawn areas in the project site, and to replace this surface material with topsoil.[5] Plaintiff appealed this decision, and, in 1964, the Board found that plaintiff was entitled to "an equitable adjustment of the contract * * * price * * *" for stripping of surface soil the contracting officer, but not the contract, had required,[6] and also to "an equitable adjustment for covering the lawn areas with topsoil * * *."[7] ASBCA No. 8554, 1964 BCA ¶ 4045.

On remand, the contracting officer, under "more specific direction of a superior," made a decision that plaintiff was entitled to an equitable adjustment of $109,599 for the "change." Plaintiff

---

2. The record reflects a drop of approximately 100 feet in 1500 feet.

3. An estimated 30 percent of this work had been completed by the time plaintiff received notice to proceed on March 19, 1962.

4. As used here, the word means topsoil below the first 6 inches of such topsoil. By May 7, 1962, only approximately 150 cubic yards of "topsoil" remained, and plaintiff agreed to remove this soil.

5. In consequence, dirt on the lawn areas had to be stripped and removed, to adapt these areas for the reception of topsoil.

6. The Board rejected the Government's contention "that topsoil within the meaning of this contract is all surface material." "The contract requirement * * * for stripping was the removal, over the entire area and *up to a depth of six inches,* of fertile, friable natural loam, containing a liberal amount of humus and capable of sustaining vigorous plant growth." (Emphasis supplied.)

7. The contract requirement respecting lawn areas was only "that they be tilled to a light and friable consistency and a fertilizer introduced into the top four inches of soil."

timely appealed this decision,[8] with results indicated generally above, and specifically hereinafter.

The Board concluded that in August 1962 the contracting officer had "imposed [on plaintiff] a *new* requirement to strip 6 inches of surface material from all lawn areas and replace it with topsoil," and that plaintiff "was completely justified, in the period prior to August 1962, in moving into the area sufficient fill to balance its earth requirements." The "pertinent question," the Board stated, "is to what extent the area had been brought to proper elevation at that time and properly graded." On this factual problem, the Board found that "in August 1962 some approximation of correct elevation had been attained over substantially the entire area although there was an excess of dirt and grading had not accurately been established."[9]

"The six inch stripping for topsoil [required by the contracting officer's August 1962 decision] commenced in the fall of 1962 and continued into 1963. During the period of this work there was also generated excess dirt from high elevations, the smaller excavations abovementioned [for sidewalks, curbs, gutters and the cutting of drainage patterns], an accumulation from basements, the readjustment of slopes, an accumulation from utilities installation and spillage. In a word all of the cutting and hauling [of dirt] was not attributable to the change."

The Board's ultimate disposition of the matter necessitates discussion of plaintiff's several claims, and of the Board's action on them, at this point. Before the Board, plaintiff sought, for nine "items," $550,565.65. To the latter sum plaintiff added, "successively and cumulatively, a 15% overhead, a 10% profit and 1% for a bond premium which in themselves are agreed to be appropriate additive percentages,"[10] thus arriving at a total claim of $703,430.21.

The Board characterized plaintiff's separate items as falling into two categories, and considered them accordingly. In the first category[11] were grouped these items:

| Item | Claim |
|---|---|
| 1. Cost of removing and storing 15,000 "extra" cubic yards of topsoil ..................($11,250).. | |
| and replacing it with fill material ....($22,500).. | $ 33,750.00 |
| 2A. Estimated cost of piling excess dirt removed from lawn areas to make room for topsoil (performed by subcontractor) .............................. | [12] 14,720.00 |
| 2B. Labor costs of piling excess dirt .................. | 17,594.88 |
| 2C. Equipment costs of piling excess dirt .............. | 68,026.37 |
| 3. Spreading of topsoil .......................... | 53,128.00 |
| Total ........................................ | [13]$187,219.25 |

8. During the pendency of the appeal, the contracting officer "now finds, as a result of recent additional investigation and studies," that plaintiff was entitled to no adjustment in contract price under its topsoil claim.

9. Plaintiff concedes that this finding is fully supported by the administrative record.

10. It was stipulated that the quoted adjustments should be added to any award to plaintiff.

11. The Board termed these items "the direct costs of the changed work itself, i. e., labor and equipment cost for the handling of the dirt required to be moved."

12. Plaintiff's motion, after the taking of testimony, to amend its claim on item 2A to $35,000, and to increase its total claim accordingly, was denied by the Board as "untimely." This ruling is discussed *infra*.

13. Not including any adjustment for overhead, profit, and bond premium. With

The Board found that plaintiff was entitled to the $11,250 claimed for removing and storing 15,000 "extra" cubic yards of topsoil,[14] and to "a reasonable price" for replacing this removed topsoil with "other fill material" (item 1). The Board concluded that $1.50 per cubic yard for the fill material [15] "is a proper pricing base to be used here but it should be adjusted for such noncompaction as was required (where the topsoil had been removed from cut areas) and for the inclusion therein of an overhead and profit which are separately to be allowed in this proceeding." The Board also found that the amount claimed for spreading of topsoil (item 3) should be allowed in full.

Item 2 was composed of three elements: item 2A (the estimated cost of piling excess dirt, performed by C.M.C. Construction Company prior to termination of its contract with plaintiff) and items 2B and 2C (plaintiff's claimed cost of labor and equipment for piling excess dirt).[16] Plaintiff's unamended claim on item 2 totaled $100,341.25, before adjustments for overhead, profit, and bond premium. The Board found that:

> For the most part * * * the actual incurred obligations for grading and dirt hauling as represented by these schedules 2B and 2C are not subject to serious question and we do not doubt that a substantial portion is attributable to the six inch removal requirement. We are quite as firm, however, in our belief, and we do find that an indeterminate portion is rightly to be assigned to other dirt moving operations. * * * [17]

In discussing the problem of evaluation of these claims, the Board stated that:

> Our principal difficulty is in deciding how much of the sums claimed under Item Nos. 2A, 2B, and 2C are chargeable to the six inch removal over the lawn areas. Except for minor sums which are of no real significance in the context of this case, all the money claimed was expended for dirt handling but an appreciable but indefinite sum represented the costs of handling which was unrelated to the Change and which we have more fully identified.
>
> The possibility of some error in making an evaluation on this record is manifest but we are not thus deterred for it would be patently unjust to deny for that reason payment for the obviously substantial cost of adapting all the lawn areas for the reception of 6 inches of topsoil, whatever may have been the state of grading in August 1962.

The question of the equitable adjustment due plaintiff under items 1, 2, and 3 [18] was resolved by the Board as follows:

> It is our finding and decision that the [plaintiff] should receive an increase in the price of its contract of $174,000 which sum includes an allowance for overhead, profit and bond premium.

To recapitulate, on items 1 and 3, plaintiff was granted a "gross" equitable adjustment (before any allowance for overhead, profit, and bond premium) of

such an adjustment, the claims totaled $239,200.68.

14. See note 4, *supra.*

15. Plaintiff had agreed to pay C.M.C. Construction Company at this price "for fill over and above the 24,000 cubic yards estimated in the contract * * *."

16. After termination of C.M.C.'s contract, plaintiff itself stripped and removed "such part of the six inches of surface material as remained after CMC left

the job" when plaintiff was unable, because of uncertainty as to the extent of the work, to subcontract for a fixed price.

17. The Board referred to "Evidence of numerous grading errors and cuttings up to 3 feet in places, for the '6 inch' removal * * *."

18. As will be seen, the Board allowed nothing on plaintiff's other claims (items 4–9).

$86,878, less, on $22,500 of this sum, unspecified downward adjustments for "non-compaction" and for "overhead and profit." Translating the Board's total award of $174,000 into preallowance figures,[19] plaintiff was awarded approximately $136,000 for items 1, 2, and 3. Thus, on item 2, plaintiff was awarded approximately $50,000 (before allowance for overhead, profit, and bond premium) on its (unamended) claims totaling $100,-341.25.

As its first cause of action, plaintiff asserts that the Board decision is arbitrary, capricious and unsupported by substantial evidence in three respects:

a. in reducing by an undefined amount, the $22,500 claimed, under item 1, for fill material;

b. in denying plaintiff's motion to amend its claim under item 2A; and

c. in allowing substantially less than the full amount claimed under item 2.[20]

The Board characterized the balance of plaintiff's monetary claim as representing "alleged additional construction costs occasioned by the changed earth requirements but only indirectly related thereto." This claim, under several separate items, was as follows:

| Item | | Claim |
|------|---|------:|
| 4. | Damages to utilities by equipment (claimed in behalf of plaintiff's outside utilities subcontractor) | $ 17,604.41 |
| 4A. | Damages for delays (in behalf of plaintiff's outside utilities subcontractor) | 81,233.67 |
| 5. | Cost of water truck | *3,339.02 |
| | Repair work by Rocky Mountain Plastering | *1,630.67 |
| 6. | Repair work by A&B Plumbing and Heating Company | *1,859.15 |
| 7. | Additional gravel to correct road contamination | 5,252.96 |
| 8. | Extra clean-up of buildings | 16,590.52 |
| 9. | Loss of efficiency of labor due to topsoil work | 235,836.00 |
| | Total | [21] $363,346.40 |

Recovery on items 4, 4A, 7, 8, and 9 was denied, for reasons appearing hereinafter.

As its second cause of action, plaintiff contends that the Board's decision denying recovery on items 4, 4A, 7, 8, and 9 is wrong as a matter of law and is therefore not entitled to finality, and in some respects arbitrary, capricious, and unsupported by substantial evidence.

As its third cause of action, plaintiff contends that the Board's rejection, as having "no factual basis," of a claim of acceleration (made by plaintiff in a post-hearing presentation to the Board) is arbitrary, capricious and unsupported by substantial evidence.

Defendant contends, in essence, that the Board's findings of fact and any legal conclusions [22] it reached are, under Wunderlich Act Standards, entitled to finality, and that plaintiff's petition should therefore be dismissed. The is-

19. *I. e.*, before increase by the "appropriate additive percentages."

20. Plaintiff alludes, *inter alia*, to "radical reduction" of its claim, and an "inordinately low" award, on this item.

* Item denied in full by the Board, but not here at issue.

21. Not including any adjustment for overhead, profit and bond premium. With such adjustments, the claim totaled $464,-229.53.

22. Defendant sees no legal conclusion by the Board on item 9, discussed *infra*.

sues thus presented will be discussed seriatim.

## PLAINTIFF'S FIRST CAUSE OF ACTION

Item 1: Cost of replacing removed topsoil with fill.

On this item, for which, in pertinent part, plaintiff claimed $22,500 (plus overhead, profit and bond premium adjustments), the Board found that plaintiff was entitled to a "reasonable price" for replacing the "removed 15,000 cubic yards of topsoil with other fill material," and that $1.50 per cubic yard was a "proper pricing base." This figure, however, was "adjusted [downward] for such non-compaction as was required (where the topsoil had been removed from cut areas) and for the inclusion therein of an overhead and profit which are separately to be allowed in this proceeding."[23]

Recognizing that the precise "downward" adjustments made by the Board are not ascertainable from the administrative record, plaintiff contends that the Board's failure to grant the full amount claimed (plus the "agreed" allowance for overhead, profit and bond premium) is arbitrary, capricious and unsupported by substantial evidence. Plaintiff asserts (1) that defendant did not even raise "the issue of non-compaction" before the Board, (2) that any overhead or profit included in the $1.50 per cubic yard price was not plaintiff's and was not duplicated by an allowance of overhead and profit for plaintiff, and (3) that the Board's reduction for these factors is therefore improper.

In response, defendant urges that the Board, in its "expertise," made a reduction in the $1.50 per cubic yard rate "because presumably a portion of the additional fill did not have to be compacted," and that the "presumption was well taken * * *." And, defendant says, the Board properly concluded that "in asking for the full subcontract price, plaintiff had included its own profit and overhead."

### The "non-compaction" reduction.

The Board's allusion to "such non-compaction as was required" is murky. By, this, however, the Board apparently meant that, "presumably" some of the 15,000 cubic yards of fill did not have to be compacted. This "finding" if such it be, cannot stand. See Koppers Co. v. United States, 405 F.2d 554, 186 Ct.Cl. 142 (1968); Bell v. United States, 404 F.2d 975, 186 Ct.Cl. 189 (1968).[24]

Requiring the removal and storage of approximately 15,000 additional cubic yards of topsoil, at a time when plaintiff was faced with an earth deficiency, increased plaintiff's borrow position by approximately 15,000 additional cubic yards of fill. The record abundantly reflects that the additional fill had to be brought onto the project site *and compacted*, and is barren of any contradictory evidence. In this state of the administrative record, a downward adjustment, on the ground that "presumably," a portion of the fill did not have to be compacted, is "arbitrary and unsupported by substantial evidence." United Contractors v. United States, 368 F.2d 585, 601–602, 177 Ct.Cl. 151, 172–173 (1966).

### The overhead and profit reduction.

The Board's downward adjustment for overhead and profit, "which are separately to be allowed in this proceeding," is also invalid. There is no showing in the administrative record as to the extent, if any, the $1.50 per cubic yard rate included overhead or profit.[25]

---

23. The Board subsequently stated that "the amount claimed under Item 1 is subject to downward adjustment because presumably, a portion of the 15,000 cubic yards of soil replaced did not have to be compacted and the $1.50 rate included overhead and profit."

24. Cf. Loral Electronics Corp. v. United States, 387 F.2d 975, 981, 181 Ct.Cl. 822, 833 (1967).

25. With specific knowledge of plaintiff's claim for $1.50 per cubic yard for 15,000 cubic yards of fill, the government stip-

The Board apparently recognized this, for on its face, "presumably" [26] also qualifies "overhead and profit." Thus, there is nothing by which to measure any diminution, by use of a "profit and overhead" factor, of the equitable adjustment due plaintiff for fill. *Cf.* Bruce Constr. Corp. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963).

According to defendant (and this is its sole argument on this point), the Board "properly concluded" that plaintiff, in claiming a rate of $1.50 per cubic yard, had included its own overhead and profit. Defendant's argument is neither supported by record citation nor convincing; the Board did not so find, and any such finding, if made, would have been "arbitrary and unsupported by any substantial evidence." See Bell v. United States, *supra*, 404 F.2d at 983, 186 Ct.Cl. at 204. In short, neither the record nor defendant's argument reflects any proper ground for the Board's unmeasurable deduction for "overhead and profit."

Plaintiff is therefore entitled on this item to $22,500 ($1.50 per cubic yard for 15,000 cubic yards of fill), plus, "successively and cumulatively," the percentages for overhead profit, and bond premium agreed to by the parties before the Board as appropriate, less the presently unascertainable amount (including "separately * * * allowed" overhead and profit) it was awarded therefor. The amount due plaintiff on this item must be determined in further administrative proceedings. United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

Item 2: Cost of piling excess dirt.

Under items 2A, 2B, and 2C, plaintiff claimed a total of $100,341.25, before ap-propriate allowances for overhead, profit, and bond premium. On findings quoted heretofore, and not here repeated, the Board awarded plaintiff, before adjustment for overhead, profit, and bond premium, approximately $50,000 on item 2.[27]

Plaintiff asserts generally that the Board's action is arbitrary, capricious, and unsupported by substantial evidence, and particularly that the Board's decision lacks finality because of (1) a legally erroneous refusal to permit plaintiff to amend its claim under item 2A from $14,720 to $35,000; (2) a refusal to "Give Evidentiary Weight" to an affidavit by the president of C.M.C. Construction Company;[28] and (3) the establishment of an "inordinately low" equitable adjustment for the cost of piling excess dirt, a "radical reduction" inconsistent with both the evidence before the Board and the Board's own findings of fact. Defendant controverts each of plaintiff's arguments, contending in substance that the Board's award is, under Wunderlich Act standards, entitled to finality.

Plaintiff's first two claims of error arise from government counsel's submission to the Board, after the taking of all testimony in the case, of an affidavit of Mr. David L. Curtis, president of C.M.C. Construction Company, with an expression of belief that the "statement of Mr. Curtis clearly demonstrates that his deposition should be taken." [29] Plaintiff subsequently advised the Board that it had "no objection to having [Mr. Curtis' affidavit] included in the record as an exhibit for the Government," and the Board opinion reflects that it "was received in evidence without objection * * *."

---

ulated that on any award to plaintiff, overhead, profit, and bond premium should be added.

26. Note 23 *supra*.

27. The nature of the Board's decision precludes any more definite statement.

28. While plaintiff deems the affidavit "an admission against interest" by defendant, it plainly is not. *See* IV Wigmore on Evidence § 1075 (3rd ed. 1940).

29. Mr. Curtis' deposition was not taken.

Mr. Curtis' affidavit recited in part that "After C.M.C. had completed the project to the elevation stakes set by [plaintiff's] engineers, C.M.C. was directed by [plaintiff] to regrade the project so as to make room for six inches of topsoil; that is, C.M.C. was directed to lower the base grade throughout the project by six inches so there would be room for six inches of topsoil and leave the project at the elevations called for in the specification." Mr. Curtis' affidavit also indicated that, "after performing such regrade work as directed by [plaintiff], C.M.C. submitted a statement to [plaintiff] for such work in the sum of $35,000, which sum has never been paid."

On the basis of this affidavit, plaintiff thereafter moved to amend its claim under item 2A from $14,720 to $35,000. The Board ruled that the request was "untimely," and denied it, adding that "this unsupported statement of the value of CMC's services would be entitled to little if any weight." [30]

Whether the Board "erred as a matter of law" or committed "gross error" in denying plaintiff's motion to amend need not be resolved. Cf. Tankersley v. United States, 179 Ct.Cl. 294 (1967); Gelco Builders & Burjay Const. Corp. v. United States, 369 F.2d 992, 177 Ct.Cl. 1025 (1966). For, the Board committed no error in its evaluation of the evidentiary worth of the affidavit. "It could not offer any basis for an award * * * for it was brief, undocumented, and conclusory rather than explanatory." Sternberger v. United States, 401 F.2d 1012, 1015, 185 Ct.Cl. 528, 534 (1968).[31]

■ Plaintiff asserts that "the fair and reasonable value of the work [under item 2A] must be not less than $14,720.-00 and no more than $35,000.00." The thrust of plaintiff's argument seems to be that because of the receipt in evidence of the affidavit, the minimal fair and reasonable value of the work in question became $14,720, the amount of plaintiff's unamended claim. Thus, plaintiff urges, the Board "at the very least should have accepted plaintiff's figure rather than establishing a price based on no evidence at all." The latter assumption for the moment aside, the result plaintiff seeks is not a sound one. If evidence is itself of doubtful probative value,[32] the receipt of other unprobative evidence does not transmute the former into incontrovertible proof.

The crucial question, then, is whether the "price" established for item 2 (including item 2A) is arbitrary, capricious, so grossly erroneous as to imply bad faith, or unsupported by substantial evidence.

■■ An "equitable adjustment" of the amount due plaintiff on item 2 involves "merely * * * inquiries of fact." United States v. Callahan Walker Constr. Co., 317 U.S. 56, 61, 63 S.Ct. 113, 87 L.Ed. 49 (1942). In such a case, "Our initial task * * * is to determine whether substantial evidence exists to support the Board's findings of fact." Koppers Co. v. United States, supra, 405 F.2d at 556, 186 Ct.Cl. at 147.

This "standard goes to the reasonableness of what the agency did on the basis of the evidence before it." Id., quoting United States v. Carlo Bianchi & Co., 373 U.S. 709, 715, 83 S.Ct. 1409, 1414, 10 L.Ed.2d 652 (1963). The task involves an issue "very different from the question of whether the Appeals Board deci-

30. The Board found that plaintiff "does not acknowledge its obligation to pay CMC the claimed $35,000 and in fact denies that CMC ever furnished such a statement of account." Plaintiff does not question these findings. Indeed, plaintiff's brief recites that it was not informed of the amount of C.M.C.'s claim "until the administrative hearing was under way."

31. See also River Constr. Corp. v. United States, 159 Ct.Cl. 254, 259 (1962).

32. The "only evidence in support of the claimed $14,720" was given by a witness who did not know "the actual extent of the work done, the time involved or the equipment used * * *."

sion was correct. This court may well disagree with the Appeals Board decision but unless the plaintiff has shown the defects described by the Wunderlich Act, there can be no recovery here." River Constr. Corp. v. United States, *supra,* at 261, note 31; and *see* Koppers Co. v. United States, *supra,* and cases there cited.

Plaintiff tried to convince the Board that all of the expense claimed under item 2 was attributable to earth moving which resulted directly from the "change" made by the contracting officer in August 1962.[33] It is clear, however, that the Board's findings that "all of the cutting and hauling was not attributable to the change"; that "an indeterminate portion [of the cost] is rightly to be assigned to other dirt moving operations"; and that "all the money claimed was expended for dirt handling but an appreciable but indefinite sum represented the costs of handling which was unrelated to the Change * * *," are entitled to finality. Koppers Co. v. United States, *supra;* Bell v. United States, *supra.*

Plaintiff points to nothing in the administrative record undermining those and other findings showing plainly that not all of the amount claimed under item 2 was properly attributable to the change. Plaintiff does refer to "a flimsy supposition" and to "a totally unsupported assumption" by the Board that "not all of the costs stated related to" the change, but mere allegations of this nature are insufficient to overturn Board findings. J. A. Jones Constr. Co. v. United States, 395 F.2d 783, 791, 184 Ct.Cl. 1, 15 (1968); Sundstrand Turbo

v. United States, 389 F.2d 406, 182 Ct.Cl. 31 (1968).

A government contractor bears the "burden of establishing the fundamental facts of liability, causation, and resultant injury." Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968, 173 Ct.Cl. 180, 199 (1965). Faced with a record which showed a change, and resulting "obviously substantial cost," but no precise measure of defendant's responsibility therefor, the Board reached a jury verdict.[34] In the circumstances of this case, such a verdict can suffice. Phillips Constr. Co. v. United States, 394 F.2d 834, 184 Ct.Cl. 249 (1968); *cf.* Blount Brothers Constr. Co. v. United States, 180 Ct.Cl. 35 (1967).

After careful review of the administrative record, it is concluded that the Board's findings and determinations on item 2 are entitled to finality. The Board clearly saw the manifest possibility of "some error in making an evaluation on this record * * *." Given this record, the result reached was within the zone of reasonableness, and the court's "imprimatur is one of reasonableness, not rightness." *See* Bell v. United States, *supra,* and cases there cited. A fair analysis of the Board's determination is persuasive that it "represented the best judgment of the fact trier on the record before it, and this 'is all that the parties have any right to expect.'" Phillips Constr. Co., v. United States, *supra,* 394 F.2d at 842, 184 Ct.Cl. at 263.[35]

## PLAINTIFF'S SECOND CAUSE OF ACTION

Item 4: Damage to utilities.

Damage to outside utilities "was caused, as claimed, by earth moving

33. Plaintiff offered an estimate, prepared by a professional civil engineer (who testified as an expert), of the reasonable cost of removing 6 inches of soil from lawn areas. The Board properly discounted this testimony observing "that it was based in part on unidentified photographs and the 'verbal descriptions by EMF's personnel of the conditions peculiar to this job'", and that the estimate rested "on two specific assumptions of fact which we cannot find on the entire developed record: * * *."

34. That "the Board did not fully articulate its computations" (Phillips Constr. Co. v. United States, 394 F.2d 834, 842, 184 Ct.Cl. 249, 263 (1968)), at least in terms of its award on separate items, is regrettable but not, in and of itself, fatal.

35. *See also* Red Circle Corp. v. United States, 398 F.2d 836, 185 Ct.Cl. 1 (1968).

equipment used, in part, in the stripping of lawn areas." [36]   In denying recovery on this item, the Board found that plaintiff had "simply employed such equipment as was available and its negligent operation accounted for much of the damage." [37]

Plaintiff here asserts, in essence, that, in stripping the lawn areas, its use of equipment that "predictably" would damage *underground* utilities [38] was justifiable, and defendant does not quarrel with that assertion.   Plaintiff also says that "there was no evidence of negligence in the use of such equipment," and that the cost of repairing the damage is payable as part of an "equitable adjustment" for the change.   Defendant contends, in essence, only that the Board finding that negligent operation accounted for much of the damage to utilities is supported by the record.

■ As far as defendant's argument goes, it is valid.   The Board's finding that negligent operation accounted for *much* of the damage does have substantial evidentiary support.   But, the natural reading of the Board's language is that the "available" equipment "used, in part," to accomplish the change, even without negligence, caused *some* damage to utilities.   And, there is uncontradicted evidence that the equipment so used did cause some damage to (at least) underground utilities absent any showing of negligence.[39]   Any such damage which was a direct result of the "change" is compensable.   *Cf.* Paul Hardeman, Inc. v. United States, 406 F.2d 1357, 186 Ct. Cl. 743 (1969).[40]

■ In sum, while plaintiff's argument that it is entitled to full recovery on this item is untenable, the Board's conclusion that plaintiff is entitled to none is not entitled to finality.   *Cf.* Bell v. United States, *supra*.   Findings as to the extent, if any, of damage to utilities directly attributable to the change, and, for any such damage, as to an equitable adjustment therefor, must be made in further administrative proceedings. United States v. Anthony Grace & Sons, Inc., *supra*.

Item 4a:   Damages for delay (claimed in behalf of Pieler Construction Company, plaintiff's outside utilities subcontractor).

■ In its initial brief in this court, plaintiff contended that the "grading change made by the Government" disrupted job schedules and progress of, and caused substantial delay and interference to, Pieler.[41]

The Board's findings on this item are as follows:

This subcontractor claims costs of equipment, supervision, labor and overhead and management under headings of Commencement Delay, Sanitary Sewer, Storm Sewer and Water and Gas Lines as well as an item of interest and discount expense during an extended construction period.   The appellant's case in its behalf is entirely in the testimony of the subcontractor's officers given in the Federal Court proceedings.   In this action the subcontractor did not draw any distinction between work under the changed requirements and the appellant's other grading operations and made no attempt to attribute its difficulties to the former alone.   On the contrary it

---

36. Plaintiff (in behalf of its outside utilities subcontractor) claimed $17,604.41 under this item.

37. There was no criticism of plaintiff's choice of means of stripping the lawn areas.

38. Not all utilities damaged were "underground."

39. Defendant's brief recites that surface utilities were "knocked down" and "sub-

surface [utilities] * * * crushed by the heavy grading and earth-moving equipment used by plaintiff."

40. *See also* Reda, Impact Costs of Acceleration, 25 Fed.B.J. 238, 240–241 (1965).

41. Plaintiff cited, in support of this statement, testimony concerning "grade changes" made "before any buildings were erected," and before the constructive change in August 1962.

did appear and we specifically find: (1) All commencement delay suffered prior to 7 May 1962 was for reasons unrelated to the changes which are the subject of this appeal. On that day all of the required stripping operations had substantially been completed. (2) Work on the sanitary sewer was substantially completed on 23 July 1962 prior to the time (August) a decision was made on topsoil for the lawn areas. (3) Work on the storm sewer was substantially completed in September 1962 which was prior to the time (October) the changed work was commenced in the lawn areas. (4) Only a relatively minor part of the water and gas distribution system (sprinkler system and 440 of 18,000 feet of gas lines) remained to be installed during the period subsequent to November 1962 when the overhead and management expense is claimed to have been incurred.

The foregoing findings are not exhaustive but it thereby appears that there is no substantial connection between the costs and the changes and if incurred, they flowed from unrelated circumstances.

These findings were neither challenged directly, nor even mentioned, in plaintiff's initial brief here. Such an approach does not facilitate the difficult task of deciding cases of this nature, complexity and bulk.[42] *Cf.* Jefferson Constr. Co. v. United States, 368 F.2d 247, 252, 177 Ct.Cl. 581, 589 (1966).

Plaintiff's reply brief does assert that the findings of the Board on this item

are "lacking in support," but it has not borne its burden of supporting the assertion. J. A. Jones Constr. Co. v. United States, *supra;* Koppers Co. v. United States, *supra.* The Board's findings have not been shown to be lacking in substantial evidentiary support, and are therefore entitled to finality; the Board's conclusion that "there is no substantial connection between the costs and the changes and if incurred, they flowed from unrelated circumstances," has not been shown to be in any way erroneous. Plaintiff is therefore not entitled to recover on this item.

Item 7: Replacing contaminated gravel.

Plaintiff argues that the Board is "in error" in denying any recovery on this item;[43] that "the overwhelming bulk" of the contamination was the direct result of the "change";[44] that the cost of replacing contaminated gravel is clear; and that the Board's findings that "the cost 'cannot be ascertained' " is therefore directly contrary to the evidence. Plaintiff also urges that where Government responsibility for damage is clear, lack of certainty as to the amount of damage does not preclude recovery. J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 247, 171 Ct.Cl. 70, 86 (1965).

Plaintiff's allegation that the overwhelming bulk of the contamination was the direct result of the change is unfounded. While there is testimony in the record that the gravel would not have become contaminated but for the change, there is also substantial contradictory evidence. Spills as a result of grading,

---

42. The administrative record contains, *inter alia,* approximately 1500 pages of testimony.

43. Viewing the item as a claim for correcting "the contamination of the gravel base of roads under construction by spillage and otherwise," the Board found that it was "reasonable to believe * * * that some of this contamination resulted from the additional earth movement but * * * that it was a completely unidentifiable part, and its cost cannot be ascertained. We believe too, that it was a small part and the extra cost it occasioned is not significant."

44. Plaintiff asserts that the change required the removal of 56,900 cubic yards of earth and an equivalent amount of replacement topsoil. The assertion is not supported by the record. Mr. Krell's figure of 60,000 cubic yards was aimed at top soil stripped (item 1), and Mr. Greenebaum's estimate reflected an unsupported assumption "that all lawn areas and all parts of all lawn areas were six inches above final elevation in August 1962."

traffic unrelated to the change, and the nature of the soil on which the gravel was placed,[45] all played a part in the contamination, according to the administrative record. In these circumstances the implicit finding that contamination resulted from several causes, many having no relation to the change, is supported by substantial evidence. Phillips Constr. Co. v. United States, *supra*; Sternberger v. United States, *supra*, 401 F.2d at 1016–1017, 185 Ct.Cl. at 536.

The essence of plaintiff's argument is that *all* of the cost of rectifying gravel contamination is recoverable. That argument is, for reasons indicated, not a sound one. While plaintiff's total cost of replacing contaminated gravel is established by the administrative record, the Board found that the cost of rectifying that amount of contamination resulting from the "change" "cannot be ascertained." On this record, that finding deserves finality. Sternberger v. United States, *supra*.

■■■ The ascertainment of damages, or of an equitable adjustment, is not an exact science, and where responsibility for damage *is* clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: "It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation." Specialty Assembling & Packing Co. v. United States, 355 F.2d 554, 572, 174 Ct.Cl. 153, 184 (1966); WRB Corp. v. United States, 183 Ct.Cl. 409, 425 (1968).[46] But, plaintiff has the burden, in this court and in the circumstances of this case, of showing specifically "why the Board's findings of fact are arbitrary, capricious or not supported by substantial evidence."

J. A. Jones Constr. Co. v. United States, *supra*; Sundstrand Turbo v. United States, *supra*. Plaintiff has not borne its burden; accordingly, it cannot recover on this item. Sternberger v. United States, *supra*.

Item 8: Cost of "Extra Clean-Up."

■■■ Plaintiff claimed, as directly attributable to "the extra dirt generated as a proximate result of" the change, cleaning costs of $16,590.52. The Board noted (and properly) that, under the contract, the "houses had to be clean for inspection to the point of readiness for immediate occupancy." In denying plaintiff's claim on this item, the Board stated that "We perceive that a single cleaning was sufficient for that purpose and if any extra effort was required we are not satisfied it has been measured or was measurable." Plaintiff asserts that there is undisputed testimony "in direct contradiction" to these findings.

The record discloses that the project site was windy, and that the change required substantial grading and earth moving (although not all of the "cutting and hauling" was attributable to the change). Plaintiff's witness, Mr. Maxwell, testified that "dust from this earth that was being placed and or removed was continually blowing"; that "on occasions," or "in cases," some cleaning operations were performed more than once; that "by the time we got down to the final clean up, we had * * * what we felt was an excessive amount of dirt which had accumulated in these units as a result of continued removal and shifting and placing of soil"; and, in essence, that because of the excessive dirt final cleanup was more costly than it would have been had the "soil * * * been stabilized previously."

---

45. The assistant general manager of plaintiff's supplier of gravel testified that the soil was "a loose sandy condition," and that even light vehicular traffic would cause "some contamination," as would heavy equipment "if there wasn't a thing dropped on it * * *."

46. " * * * we have allowed so-called 'jury verdicts' if there was clear proof that the contractor was injured and there was no more reliable method for computing damages—*but only where* 'the evidence adduced [was] sufficient to enable a court or jury to make a fair and reasonable approximation.'" (emphasis supplied). *See also* Bell v. United States, *supra*.

Mr. Maxwell also testified that clean-up cost plaintiff approximately $36,000; that during the course of the work the "extra cost of clean up" had not been "separated," because "it would be impossible to separate this particular item from the cleanup, over-all cleanup item * * *"; and that he "just estimated and apportioned this amount as shown on Item No. 8 as what [he] thought as being a fair and reasonable price for this item." "* * * it was one clean-up operation and it was impossible for [him] to keep this particular item * * * separate from the other regular normal cleanup operations."

Mr. Maxwell was unable to explain satisfactorily why more than one cleaning was necessary. He was far from specific as to the extent of recleaning. He indicated that units "had previously been swept and cleaned, not cleaned up as you would clean them up for acceptance by the Air Force but they were cleaned periodically throughout this project * * *." He made no effort to separate costs of recleaning from extra costs of cleaning attributable to the "excessive" amount of dirt. It is obvious from his testimony that he attributed all claimed excess cleaning costs to the change. And, his testimony admittedly was no more than an estimate.

In this state of the record, the Board found that a single cleaning was sufficient to comply with plaintiff's contractual obligation, and that "if any extra effort was required we are not satisfied that it has been measured or was measurable." Given this record, it cannot be concluded that the Board's findings are invalid. Sternberger v. United States, *supra*; Clack v. United States, 395 F.2d 773, 777, 184 Ct.Cl. 40, 46 (1968).

Item 9: "Loss Of Efficiency Caused By Re-Scheduling The Work And Performing It Out-Of-Sequence."

On this item, which plaintiff characterized before the Board as "loss of efficiency by trades due to the disjointed operation required because of the requirement to remove 6″ of dirt and replace it with topsoil," recovery was denied. The Board observed that plaintiff had computed the claim by applying, to total payroll for various operations, a 30 percent for loss of efficiency factor, adding to the product a 16 percent insurance factor. It viewed this proof as follows:

It is initially to be observed that the use of an estimated percentage of inefficiency unrealistically presupposes an otherwise totally efficient operation and its application to total payroll erroneously assumes that all of the earthwork during this payroll period (1963) was attributable to the changed requirements. Moreover, the 30% estimate was supported by no objective data whatsoever, not even a cost estimate or a subcontractor's price and may well be insufficient as a matter of law. (Wunderlich Contracting Company, etc., and others v. United States, 351 F.2d 956, 173 Ct.Cl. 180, decided 15 October 1965.)

The majority of the Board went on to say that, "Aside from the grave doubts raised by this lack of proof, this item presents alleged costs of a consequential type not ordinarily payable as part of an equitable adjustment in price."[47] United States v. Rice, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942) and some of its progeny were cited in support of the conclusion. A dissent agreed with the result reached, but stated that the claim should be denied for lack of proof; in the dis-

---

47. Elsewhere, the Board noted that "[t]he work remaining after the change was ill-phased to a degree because the change itself was so ill-timed, but the additional costs of ill-phasing did not result from any acceleration and are otherwise claimed under Item 9," and that the change "was of such a nature that it must adversely have affected the rest of the work."

**1360**

senter's view, the claim was not barred by the "Rice doctrine."

The parties disagree as to the basis for the Board's denial of recovery under item 9. Plaintiff asserts that the Board "questioned the adequacy of proof" but rejected the claim as one for "alleged costs of a consequential type not ordinarily payable as part of an equitable adjustment in price" barred by *Rice*. Defendant argues that the "Board denied this claim basically because of lack of proof," and that the Board's allusion to the "Rice doctrine" was "more of an aside than \* \* \* a definitive determination as to claim Item 9 \* \* \*."

■■■ A fair reading of the Board's majority opinion, and the dissent thereto, make it plain that defendant's view of the basis for the decision is an erroneous one. The majority opinion did not deny the claim on the ground of failure of proof, but on the ground that, as a matter of law, the "alleged costs" claimed were not allowable. Such a decision, on a question of law, may be considered *de novo*. Woodcrest Constr. Co. v. United States, 408 F.2d 406, 187 Ct.Cl. 249, (1969) and cases there cited.

■■■ Defendant does not defend the majority Board decision as to the effect of the "Rice doctrine." Its position is, rather, that " \* \* \* the Board did have jurisdiction[48] pursuant to the Suspension of Work clause," and that "since its decision upon the merits of claim Item 9 was supported by substantial evidence, said decision should be accorded finality."

The trouble with this is that the majority of the Board did not make a decision "upon the merits" of this claim. Despite its questioning of the adequacy of plaintiff's proof, the majority opinion recognized that the change "must adversely have affected the rest of the work," and that the work remaining after the change was "ill-phased." It cannot be concluded that, but for the legal decision—an erroneous one, for reasons next stated—all recovery would have been denied.[49]

In Paul Hardeman, Inc. v. United States, *supra*, a changed condition required additional excavation (for which payment was made) and, until the additional excavation was performed, prevented the use of one of two whirley cranes for the placement of concrete. Claim was made that increased costs resulted from the use of only one crane, that the costs were the direct result of the changed condition, and that an equitable adjustment was therefore due. The claim was denied administratively in reliance on the "Rice doctrine" (and another conclusion conceded in this court to be unsupported by substantial evidence).

In this court, defendant argued that the increased costs incurred were "suffered in the performance of work which was required under the contract, the amount and scope of which was unchanged by the changed condition," and that recovery of such "consequential" costs was barred by the "Rice doctrine." The court held that defendant had "contractually assumed the risk that it might have to pay just such costs as plaintiff claims," and that the Board had "erred as a matter of law in finding that plaintiff was not entitled to an equitable adjustment for the costs in question."

48. And defendant necessarily means "jurisdiction" to grant monetary relief by way of an equitable adjustment for item 9.

49. Plaintiff argues that the administrative record supports its "30% inefficiency factor," and that the "disastrous loss of efficiency was the direct effect of the erroneous directive." Defendant, reading the Board decision as a denial for lack of proof, concludes that the denial was proper. " \* \* \* we cannot say that only [one] conclusion is acceptable." "The Board, which is the factfinder, must therefore make the determination initially." Bell v. United States, *supra*.

Judge Davis, concurring in the court's opinion, did so "because I understand it to lay down and apply the same standard" frequently used by Boards of Contract Appeals: "That rule permits an equitable adjustment to cover increased costs which were the direct and necessary result of the *change* or changed conditions, where the condition or the *change* directly leads to disruption, extra work, or new procedures." *Id.*, at 406 F. 2d at 1362–1363, 186 Ct.Cl. 752 (emphasis supplied).[50]

*Hardeman* involved a changed condition, not a constructive change. As Judge Davis' concurring opinion reflects, however, the "rule" is not limited to changed conditions, but extends to a change as well. Thus, defendant's admission that the Board had jurisdiction to grant an equitable adjustment [51] is a proper one, and the holding that plaintiff's claim on item 9 was barred is legally erroneous. Plaintiff is entitled to an equitable adjustment "if and insofar as" the costs claimed were a direct and necessary result of the change. *A. L. Harding, Inc.*, *supra.* The question of amount, if any, is initially to be decided in further administrative proceedings.[52] United States v. Anthony Grace & Sons, Inc., *supra.*

## PLAINTIFF'S THIRD CAUSE OF ACTION

In a posthearing presentation to the Board, plaintiff advanced "a theory of acceleration under a threat of termination and a resulting out-of-phase scheduling of work." The Board rejected this theory as having "no factual basis." While "there was pressure on the [plaintiff] to meet its construction schedule * * *," "there was no acceleration." The Board noted the absence of "proof (or claim) that additional employees were engaged, or there was overtime work or that the [plaintiff] otherwise speeded its operations."

Plaintiff attacks the Board's decision as arbitrary, capricious, and unsupported by substantial evidence "To The Extent That It Denies Plaintiff Recovery For The Increased Cost Incurred As The Result Of The Threatened Default Termination Imposed By The Government In Order To Achieve An Accelerated Scheduling Of Work." [53] Plaintiff says that, where a contracting officer demands that a "contractor accelerate the work by putting more men and additional equipment on the job in order to advance the construction schedule," resulting in additional costs, there is a right to re-

50. Cited were Power City Constr. & Equip., Inc., ICBA No. 490–4–65, 68–2 BCA ¶ 7126; Gust K. Newberg Constr. Co., ENG BCA No. 2754, 67–2 BCA ¶ 6490; I. K. Constr. Enterprises, Inc., ASBCA No. 10987, 67–1 BCA ¶ 6271; Eastridge Excavating Contractors, Inc., ENG BCA No. 2683; 67–1 BCA ¶ 6379. A. L. Harding, Inc., DCAB No. PR–44, 65–2 BCA ¶ 5261, aff'd on reconsideration, 66–1 BCA ¶ 5463; and Ivey Bros. Constr. Co. ENG BCA No. 1764 (1960) (unreported). Cf. Schmid v. United States, 351 F.2d 651, 173 Ct.Cl. 302 (1965); Shedd, The Rice Doctrine and the Ripple Effects of Changes, 32 Geo. Wash.L.Rev. 62 (1963). In A. L. Harding, Inc., *supra*, for example, it was stated that the costs of a change "may include, *inter alia*, the increased cost of performance caused by disruption of the contract work if and insofar as such disruption was a direct result of the change."

51. While defendant premises this jurisdiction on the Suspension of Work clause, *Hardeman* turns squarely on the Changed Conditions clause. It is unnecessary here to say more than that "jurisdiction" did exist. *Cf.* Eastbridge Excavating Contractors, Inc., *supra;* I. K. Constr. Enterprises, Inc., *supra;* A. L. Harding, Inc. *supra;* and Power City Constr. & Equip., Inc., *supra.* See also Nash and Cibinic, The Changes Clause in Federal Construction Contracts, 35 Geo.Wash.L.Rev. 908, 937–939 (1967).

52. Further evidence on this item (and others still open) is, of course, not precluded. Bell v. United States, *supra.*

53. The quotation is from the caption of Section III, Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment, p. 58, and is there underlined.

cover such costs. It also urges that acceleration of plaintiff's work was "in fact compelled," under threat of default termination.

As the nature of plaintiff's contentions reflects, the Board made findings of fact, not conclusions of law, in rejecting this claim. *See* Phillips Constr. Co. v. United States, *supra*, 394 F.2d at 839, 184 Ct.Cl. at 258. "The burden is on the plaintiff specifically to show why the Board's findings of fact are arbitrary, capricious, or not supported by substantial evidence. Sundstrand Turbo v. United States, 389 F.2d 406, 182 Ct.Cl. 31 (1968)." J. A. Jones Constr. Co. v. United States, *supra*.

Without pointing to any evidence in the administrative record remotely disputing the facts found by the Board,[54] plaintiff simply attaches to them the talismanic words. Its burden has not been met. Accordingly, the Board's findings are final and conclusive, and plaintiff is not entitled to recover on this cause of action. Williamsburg Drapery Co. v. United States, 407 F.2d 1342, 187 Ct.Cl. 298 (1969).

It is therefore recommended (1) that plaintiff's motion for summary judgment be granted in part and denied in part as to its first and second causes of action, and denied as to its third cause of action; (2) that defendant's cross-motion for summary judgment be denied in part and granted in part as to plaintiff's first and second causes of action, and granted as to plaintiff's third cause of action; and (3) that further proceedings be stayed pursuant to Rule 100 [since September 1, 1969, Rule 167] for a period of ninety (90) days to afford the parties an opportunity to obtain an administrative resolution of the equitable adjustment to which plaintiff is entitled.[55]

54. Plaintiff does quote testimony "to the pressures placed upon the contractor by the Government" (Pltf. Brief, pp. 59–60). That testimony, however, does not contradict the Board's findings of fact.

55. United States v. Anthony Grace & Sons, Inc., *supra*.