Jules **TEITELBAUM**, Trustee for Victory Electronics, Inc., a Bankrupt

v.

The **UNITED STATES**.

No. 175–69.

United States Court of Claims.

April 14, 1972.

Julius Schlezinger, Washington, D. C., attorney of record, for plaintiff. Neil D. Naiden, George L. Edgar and Morgan, Lewis & Bockius, Washington, D. C., of counsel.

Edward J. Friedlander, Washington, D. C., with whom was Asst. Atty. Gen. L. Patrick Gray, III, for defendant.

Before COWEN, Chief Judge, and DAVIS, COLLINS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

ON PLAINTIFF'S MOTION AND DE-
FENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Harry E. Wood with direc-
tions to prepare and file his opinion

on the issues of plaintiff's motion and defendant's cross-motion for summary judgment under the order of reference and Rule 166(c). The commissioner has done so in an opinion and report filed on September 30, 1971, wherein such facts as are necessary to the opinion are set forth. Plaintiff has requested review by the court of the commissioner's opinion and recommended conclusion, defendant has urged that the commissioner's opinion be adopted by the court and the case has been submitted to the court on the briefs of the parties and oral argument of counsel. Since the court agrees with the opinion and recommended conclusion of the trial commissioner, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Accordingly, it is concluded that plaintiff's motion for summary judgment on Count II of the amended petition is granted, to the extent indicated in the opinion, but otherwise denied; that defendant's cross-motion for summary judgment on Count II is granted to the extent indicated in the opinion, but otherwise denied; that defendant's motion for judgment in its favor on its counterclaim is denied; that defendant's motion to dismiss Count I of the amended petition is granted and Count I is dismissed; and, that further proceedings herein are stayed for a period of 6 months pursuant to (and subject to the terms of) Rule 167 to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.

## OPINION OF COMMISSIONER

WOOD, Commissioner:

In Count I of the amended petition herein, plaintiff, trustee for Victory Electronics, Inc., a bankrupt, sues to recover from defendant damages for alleged breaches of contract in the approximate sum of $1,128,790. In Count II, which incorporates all of the factual allegations of Count I, and claims an identical amount, plaintiff seeks review, under familiar standards,[1] of a decision of the Armed Services Board of Contract Appeals in the matter.[2]

The litigation involves a contract between Victory and defendant, acting through the U.S. Army Electronics Material Agency, Philadelphia, Pennsylvania, for the manufacture and delivery of 2,017 units of a radio communication device called the "RT-77",[3] at a unit price of $464.99 and a total contract price of approximately $938,000.

The contract, awarded January 29, 1964, contained, among other things, standard "Changes", "Default", and "Disputes" clauses,[4] and a "Production Drawing Changes" clause excerpted below. By Modification No. 1, dated May 19, 1964, a standard "Progress Payments" clause was added.[5]

In March 1966 Victory was adjudicated a bankrupt, and in April 1966 the contracting officer terminated the contract for default. The termination was not appealed, and its propriety was not, and is not, in dispute. At issue before the Board were, however, the amounts owed by defendant (1) in consequence of Victory's correction and revision of government-furnished drawings, and (2) for inventory taken from Victory's Plainview, Long Island, plant, and from the plants of two of its subcontractors (Miles Industries and Taffet Electronics).

1. Wunderlich Act, 68 Stat. 81, 41 U.S.C. §§ 321-22 (1970).

2. ASBCA No. 12885, 70-1 BCA ¶ 8210.

3. The contract description of the unit was:
   "RECEIVER-TRANSMITTER RT 77 (  )/GRC-9; to be in accordance with Military Specifications MIL-R-12532-B with Amendment No. 5 thereto and Signal Corps Drawings and Data List SC-DL-36400-D."

4. General Provisions, Standard Form 32 (Supply Contract), September 1961 Edition. See 32 CFR 7.101 (1964 ed.); 32 CFR 8.707 (1964 ed.).

5. ASPR E-510.1 (January 1961).

The Board concluded that plaintiff was due a total of $304,697.08: [6] $46,058 for "drawing changes"; $206,798.81 for the Plainview inventory; $41,323.43 for the Miles inventory; [7] and $10,516.84 for the Taffet inventory. In Count II, plaintiff claims an "equitable adjustment" of some $527,580 for drawings work and $951,050 for "inventory", minus progress payments to Victory, thus arriving at the total of approximately $1,128,790 in suit.

Without "waiving its claim for breach of contract set forth in Count I of its Amended Petition",[8] plaintiff has moved for summary judgment on Count II. By cross-motion, defendant asks the court (1) to sustain the administrative decision at issue in Count II, (2) to dismiss Count I as well, and (3) to enter judgment in defendant's favor on its counterclaim. For reasons which follow, it is concluded that plaintiff's motion for summary judgment on Count II should be granted, to the extent indicated herein, but otherwise denied; that defendant's cross-motion for summary judgment on Count II should be granted, to the extent indicated herein, but otherwise denied; that defendant's motion to dismiss Count I should be granted; that defendant's motion for judgment in its favor on its counterclaim should be denied; and that further proceedings herein should be stayed pursuant to (and subject to the terms of) Rule 167 for a period of 6 months, to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.

I

### The Drawing Changes Claim

Defendant does not controvert plaintiff's right to be reimbursed for Victory's cost of correcting govenment-furnished drawings, a cost which plaintiff contends was at least $527,579.06. Defendant's position is, rather, that the equitable adjustment of $46,058 for drawing changes determined by the Board is, under Wunderlich Act criteria, final and conclusive. For reasons which follow, it is concluded that defendant's position on this claim must be sustained.

The RT–77 was not, in 1964, a new device. Some 669 government-furnished drawings, supplied to Victory in early February 1964 for use in fabrication of the units, dated from 1949 to 1953.[9] The Board found, and plaintiff stresses, that Victory made a total of 1,691 changes to 726 drawings, including 10 complete new drawings.[10]

By the contract's "Production Drawing Changes" clause, referred to above, Victory

a. * * * agrees to thoroughly check the furnished Government drawings and utilize same in the manufacture of the item they cover and * * to revise the drawings as directed by the Contracting Officer. Inaccuracies, incompleteness, errors, etc. of the drawings will be resolved by consultation with [U.S. Army Electronics Materiel Support Agency, Fort Monmouth, New Jersey] BEFORE proceeding with production. The Government will not be responsible for damages or extra costs resulting from an

---

6. During the course of contract performance, Victory received progress payments totaling $349,837. The Board held that the difference between this sum and the amount owed by defendant under the contract in suit ($45,139.92) "remains unliquidated and * * * is due the Government." Defendant has filed a counterclaim in this amount.

7. Plaintiff does not here challenge the Board's valuation of the Miles inventory.

8. Plaintiff's main brief, p. 2.

9. Bidders had been advised that they were "expected to examine the drawings * * * ", with failure to do so at the risk of the bidder. Prior to bidding, Victory examined the drawings furnished to it with the IFB.

10. Some drawings were changed more than once, thus explaining the seeming numerical discrepancy.

inadequate check of the drawings or revisions to the drawings. If, because of the above action, there results a change in the contract requirements, the contractor and the Government will negotiate an equitable adjustment in contract price * * *.

b. In the event changes in the contract specifications or drawings are ordered or approved by the Government, the contractor agrees upon request * * * to revise the production drawings * * *. The Government and the contractor will negotiate an equitable adjustment in price for such revisions to the production drawings in accordance with the procedure set forth in the Changes Clause * * *.[11]

Victory's contract employed the technical action request (TAR) system for "interchange of technical information, approvals and recommendations between the Government and [Victory] * * *." In some eight TAR's (19, 20, 21, 23, 24, 26, 27, and 31) [12] Victory submitted to defendant for approval the 1,691 drawing changes alluded to above. Plaintiff's claim was, and here is, that for these changes $527,579.06 is due.

According to the Board, Victory's president testified:

* * * that [after] he became aware of the drawing errors * * * in early March 1964 * * * the entire engineering staff and drafting department were detailed to find where all the mistakes were on the drawings * * * [;] that * * * all engineer-

ing and drafting [hours] spent on the inaccuracies in the prints were kept separate and were not a part of any billing in a progress payment [;] and that this time was kept in a filing cabinet in the engineering department under the category 'Changes in Drawings and Updated Drawings.' * * *

The Board found that "these records were lost after [Victory] went into bankruptcy when, according to [Victory's] president, creditors dumped them out of filing cabinets and the owner of the building 'swept all the stuff up.' " [13]

In any event, plaintiff did not introduce at the Board any contemporaneous record of the time devoted to revising the government-furnished drawings. Instead, plaintiff endeavored to establish the amount of time spent in the revision effort through the testimony of Victory's accountant and its former executive vice president.

Victory's former executive vice president did not join Victory until October 1964. Prior to the 1969 Board hearing, Victory's accountant obtained from him the names of those engineers, draftsmen, and technicians who, according to the executive vice president, had worked exclusively on the contract in suit. The accountant next examined Victory earning records (dating from July 1965) from which he extracted the number of hours worked each week by those employees whose names he had been furnished. He then examined Victory's progress payment requests, deleted from the hours shown on the earning records any time included in Victory's progress payment

---

11. In paragraph D, "Special Notes", it was further provided that:

"The equitable adjustment of the price for furnishing revised drawings in accordance with the provision titled 'Production Drawing Changes' will be based upon cost of actual preparation of drawings and will not include any engineering or design costs which cause the changes."

12. TAR 19 is dated October 15, 1964; all other TAR's which contained drawing

changes, excepting TAR 31, dated December 15, 1965, were submitted prior to July 1965.

13. The Board stated that it was difficult to "understand why the former officers of the bankrupt and the [plaintiff] trustee would permit records pertaining to proof of a claim in excess of $500,000 to be so treated."

requests,[14] and allocated all hours not so included to drawing problems.[15]

The accountant concluded that a total of 26,906 hours' time (20,040 hours by engineers and 6,866 hours by draftsmen) had been devoted to drawing corrections. Using overhead and G&A figures derived from the use of income tax returns and financial statements he had prepared for Victory, his computation of the equitable adjustment due for drawing changes was $527,579.06.

Victory's former executive vice president testified at some length with respect to several drawings which, he said, were representative of all drawings and changes thereto. He described both the changes required on each of the several drawings and the type of employee "required to ferret out a particular change * * *." He also estimated the length of time required to determine the changes, write up a TAR, and make the changes.[16] His estimate was that a total of 25,750 hours (20,750 engineering hours and 5,000 drafting hours) had been spent in determining drawing changes and in placing them on the drawings.[17] As plaintiff emphasizes, he was not cross-examined with respect to his testimony concerning the nature and extent of drawing changes.

Defendant did, however, offer testimony that the "representative" drawings described in the testimony of Victory's former executive vice president required dimensional changes of a more compli-cated nature than other contract drawings; that the dimensional changes required could have been ascertained from a normal check of the drawings; that in late September 1964 no changes had been made to any drawings; that at that time, during a 2-day visit to Victory's plant by a government draftsman, changes (largely dimensional) to about 50 drawings had been made by that draftsman and one Victory employee; that following TAR 19, in which those dimensional changes were reflected, the "vast bulk" of all changes were updating and revisions to finish and material specifications and that the majority of all the changes were the updating of specifications.

On this aspect of plaintiff's claim, the Board found, *inter alia*, that the "great majority" of the 1,691 drawing changes required "were mere revisions to, and updating of specifications"; that while it was evident that effort had been expended on drawing changes, "the evidence produced to establish that this effort represented more than 25,000 hours of engineering is wholly speculative"; that plaintiff's evidence in this respect conflicted with the testimony of defendant's witnesses, whose credibility was unshaken on cross-examination; and that on the record as a whole, "containing, as it does, contradictory evidence as to [Victory's] efforts to correct and revise the drawings," the preponderance of the evidence did not sustain plaintiff's

14. Under the contract, drawing costs were not to be included in progress payment requests.

15. The accountant testified, in essence, that his "basic theory" was that certain employees had worked exclusively on the contract in suit, and that any hours those individuals had worked which were not billed in progress payment requests were "against the drawings." Compare n. 12, *supra.*

16. It was also stipulated that he would testify (among other things) that the types of changes concerning which he had testified were representative of the types of changes made by Victory on "the remaining drawings"; that he had reviewed such drawings; that the changes (the nature of which the stipulation included) were substantial and could not in most instances have been detected by a check of the bid package drawings; and that they required a major expenditure of engineering development and drafting time.

17. The Board accurately noted that the proof did not reflect either the name of any Victory employee who had worked on a particular drawing or set of drawings, or when such work was done. No employee "was precisely related to any particular portion of the unbilled work." Nor did any Victory employee who had actually worked on drawing changes testify.

"claim of an expenditure of some 25,000 hours on this part of [Victory's] job".

The Board further stated that the disparity between the estimates of the parties, and the conflicting nature of the evidence, precluded any degree of certainty in determining the number of hours devoted to drawing changes, but that, taking into account the nature and character of the majority of drawing changes, 2.5 hours per drawing change (a total of 4,228 hours, allocated 1,000 hours to supervision and checking and 3,228 hours to drafting) was "a reasonable expenditure of effort for the drawings." Thus, the Board concluded, plaintiff was entitled to an equitable adjustment as follows:

| | |
|---|---|
| Supervision and checking (1,000 hrs. at $6.45) [18] | $ 6,450 |
| Draftsmen (3,228 hrs. at $3.50) | 11,298 |
| 1st Subtotal | 17,748 |
| 100% Plant Overhead | 17,748 |
| Material | 600 |
| 2nd Subtotal | 36,096 |
| G & A at 16% of 2nd Subtotal | 5,775 |
| | $41,871 |
| Profit at 10% | 4,187 |
| Total | $46,058 |

Plaintiff asserts that the Board erred in concluding that the "drawing errors were not of such magnitude as to entitle Plaintiff to an equitable adjustment in the contract price to reflect the full cost, including engineering time, of the 1691 drawing changes which [Victory] made." [19] Plaintiff terms the Board's "finding" that both Victory and defendant understood that the drawings, dating as they did from 1949 to 1953, were to be checked for errors and obsolescence and, where necessary, corrected, revised, and updated by Victory prior to going into production (subject, the Board also recognized, to an equitable adjustment in contract price) a conclusion of law based on the Board's interpretation of paragraph "a" of the Production Drawing Changes clause, and contends that the Board's "reliance upon this provision to relieve or reduce Defendant's responsibility for Victory's costs in correcting the Government-furnished drawings is contrary to law." [20]

While defendant does not take serious issue with plaintiff's characterization of the Board "finding", it does contend, and correctly, that the Board committed no error in its conclusion that "part of the bargain struck * * * was the agreement to revise, change and update the drawings, subject to adjustment in contract price." The contract plainly so provided.

Even more significantly, a fair reading of the Board opinion convinces that the pivotal consideration on the drawing changes claim was the state of the evidence as to the nature of required changes and the engineering and drafting time devoted to making such changes. Plaintiff's implicit assumption that the Board's determination as to the equitable adjustment due therefor was tainted by reliance on erroneous factors is without apparent factual or legal support.

Whether the Board's findings as to the nature of drawing changes and as to the engineering and drafting time devoted to drawing corrections and revisions are entitled to finality must, of course, separately be considered. Plaintiff asserts that both findings should be rejected, while defendant predictably contends that they must be upheld.

One focus of plaintiff's attack is the finding that the great majority of the drawing changes were mere revisions to, or updating of, specifications. To plaintiff, this "finding is essentially a conclusion of law and as such is erroneous" but, to the extent factual, it is in any event allegedly unsupported by substantial evidence.[21] Plaintiff points to the testimony of Victory's former executive vice president as reflecting the "actual facts" concerning the nature of drawing changes, and urges that the conflicting testi-

18. The hourly rates used by the Board are not in dispute.

19. Plaintiff's main brief, p. 8.

20. *Id.*, p. 29.

21. Plaintiff's main brief, p. 31.

mony of defendant's witnesses should have been given no weight.

■ As plaintiff elsewhere tacitly concedes,[22] the Board made a factual finding as to the nature of the drawing changes required. On review of such a finding, the Wunderlich Act does not permit this court to write on a clean slate. Northbridge Electronics, Inc. v. United States, 444 F.2d 1124, 195 Ct.Cl. 453 (1971); Donald M. Drake Co. v. United States, 439 F.2d 169, 194 Ct.Cl. 549 (1971). While the Board could have accepted the testimony of plaintiff's witnesses and thereby reached the factual view for which plaintiff contended, there is in the administrative record substantial, credible, and conflicting evidence as to the nature of the drawing changes. The Board credited defendant's, not plaintiff's, proof on this point.[23] In this circumstance, the Board's factual finding is entitled to finality. *Ibid.* See also Vann v. United States, 420 F.2d 968, 989, 190 Ct.Cl. 546, 584 (1970); Dittmore-Freimuth Corp. v. United States, 390 F.2d 664, 685, 182 Ct.Cl. 507, 540 (1968).

■ Plaintiff also challenges the Board's determination of the amount of the equitable adjustment due for drawing changes, contending that this "holding was predicated upon conclusions of law which are erroneous and operative facts which are not supported by substantial evidence." [24] *Inter alia,* plaintiff claims that the Board erred (1) in its allusion to abandonment of drawings on a refuse pile; (2) in "considering Plaintiff's proof of the quantum to which it is entitled"; [25] and (3) in failing to utilize plaintiff's claimed G&A rate in the computation of the equitable adjustment.

The genesis of the first facet of the argument is a finding that, after Victory's adjudication in bankruptcy, "drawings containing the changes which are the subject of this appeal were found on a refuse heap." The Board then observed that it was

\* \* \* difficult to understand why an auctioneer entering the plant upon authority of [plaintiff] would be permitted to take the drawings themselves —the alleged product of more than 25,000 engineering hours—and abandon them on a refuse pile.

Plaintiff avers that this "finding foreshadowed and influenced" the Board's evaluation of plaintiff's proof; that the abandoned drawings were in fact the original, defective, government-furnished drawings (with Victory's changes thereon) from which a revised set of drawings had been made; and that the abandonment of the original drawings was so irrelevant to the question of the equitable adjustment due that the Board's consideration of it was erroneous as a matter of law.[26]

Defendant counters that plaintiff has "blown up out of all proportion the affect [sic] of the wasted drawings on the Board's decision",[27] and that plaintiff's failure to protect them evidenced a complete lack of responsibility. While the latter segment of the rebuttal is unpersuasive, the former is. While the abandoned drawings undoubtedly were irrelevant to a determination of the equitable adjustment due, the Board's expression of passing puzzlement over their treatment—all that plaintiff has to rely upon for this argument—is an insufficient indicator that the fact of their abandonment had any impact on the Board's determination.

Nor does the contention that the Board erred in considering plaintiff's "proof of \* \* \* quantum" withstand scrutiny. The judgment that the preponderance of the evidence did not sus-

---

22. Plaintiff's reply brief, pp. 10–11.

23. That Victory's former executive vice president was not cross-examined on his drawing changes testimony is of "no matter." Northbridge Electronics, Inc. v. United States, *supra.*

24. Plaintiff's main brief, p. 45.

25. Plaintiff's main brief, p. 48.

26. *Id.,* p. 45.

27. Defendant's main brief, p. 32.

tain plaintiff's claim of more than 25,-000 hours drawing changes time involved issues of credibility and evaluation of the probative worth of the conflicting evidence proffered. Plaintiff has failed to show that this determination is either unsupported by substantial evidence or erroneous as a matter of law. Northbridge Electronics, Inc. v. United States, *supra;* Electronic & Missile Facilities, Inc. v. United States, 416 F.2d 1345, 189 Ct.Cl. 237 (1969); Sternberger v. United States, 401 F.2d 1012, 185 Ct.Cl. 528 (1968); Dittmore-Freimuth Corp. v. United States, *supra.*

■ Wunderlich Contracting Co. v. United States, 351 F.2d 956, 173 Ct.Cl. 180 (1965) fails to support the contention that the Board erred as a matter of law in declining to believe plaintiff's evidence as proffered. Under *Wunderlich,* a "reasonable basis for computation, even though the result is only approximate", is at the least a prerequisite, and it cannot be concluded that the Board committed legal or factual error in declining "to accept plaintiff's evidence in toto * * *." Sternberger v. United States, *supra,* 401 F.2d at 1017, 185 Ct.Cl. at 536, see also Electronic & Missile Facilities, Inc. v. United States, *supra.*

The related argument that the "Board's determination that Victory's costs were unreasonable violates the precept that such costs must first be presumed to be reasonable"[28] is specious. Bruce Constr. Co. v. United States, 324 F.2d 516, 163 Ct.Cl. 97 (1963), cited in support of the argument, is plainly inapposite. Boyajian v. United States, 423 F.2d 1231, 1242–1244, 191 Ct.Cl. 233, 252–254 (1970). The Board's finding was that plaintiff's proof failed to substantiate the claim asserted. In this

Wunderlich Act review, that finding can only be upheld.

Plaintiff's briefs suggest that Maxwell Electronics Company encountered "similar problems * * * in revising the Government-furnished drawings while attempting to produce RT–77 sets under the Small Business set-aside portion of the same IFB"; that Maxwell was paid a total of $263,000 for changes during the course of its RT–77 contract; that at least $252,000 was for costs incurred by Maxwell in producing a revised set of reproducible drawings; and that this is "strong support" for the validity of plaintiff's claim of more than double that amount for drawing changes.[29]

The administrative record reflects that the Maxwell contract paperwork was made available to plaintiff for inspection on or before May 1, 1969. The final day of the Board hearing, at which the Maxwell documents were offered and received into evidence, was July 24, 1969. There is, however, no testimonial illumination of the Maxwell documents, and they are certainly not self-explanatory. In the premises, the inference here sought cannot fairly be drawn. All else aside, no meaningful relationship between Victory's work in correcting government-furnished drawings and payments to Maxwell has been demonstrated.[30]

■ Plaintiff's insistence upon the credibility of those witnesses who testified in support of the claim here made, and the concomitant denigration of the conflicting proof, do not serve to fault the Board decision respecting the time devoted to drawing changes. The administrative record undeniably established that "effort was expended on drawing changes". Lacking any precise measure-

---

28. Plaintiff's main brief, p. 48.

29. Plaintiff's reply brief, pp. 5–7.

30. Despite the Board's stated expectation that plaintiff's brief "discuss the relevancy of the Maxwell contract and the TARs and the amendments in connection with the Victory appeal", and plaintiff's

representation that "We will do that", plaintiff's briefs to the Board mention the payment to Maxwell only casually; the presently purported impact of that payment on the amount of the equitable adjustment due Victory for drawing changes is not argued.

ment of defendant's responsibility therefor (and the Board did not err in declining to swallow the evidence of one party or the other), the Board properly resorted to a "jury verdict" approach. Electronic & Missile Facilities, Inc. v. United States, *supra*, 416 F.2d at 1355, 189 Ct. Cl. at 253 (1969); Phillips Constr. Co., Inc. v. United States, 394 F.2d 834, 842, 184 Ct.Cl. 249, 263 (1968). The result reached was well within the zone of reasonableness.

The issue is not whether, on an independent study of the administrative record, a like conclusion as to the equitable adjustment due plaintiff would here be reached, but whether, under the criteria contained in the Wunderlich Act, the Board's conclusion is deserving of finality. On a fair analysis, that conclusion "represented the best judgment of the fact trier on the record before it, and this 'is all that the parties have any right to expect.'" Phillips Constr. Co., Inc. v. United States, *supra*.

There remains the question whether the Board erred in rejecting plaintiff's claimed G&A rate of 70 percent in computing the equitable adjustment due for drawing changes. Plaintiff relies upon the testimony of Victory's accountant based upon his copy of Victory's 1964 Federal income tax return and his own worksheets for 1965,[31] and an April 1965 Army audit recommending a 70 percent G&A rate for progress payments 1 through 11, as establishing error in this respect.

By agreement between Victory and defendant, the G&A rate in subsequent progress payments was substantially reduced to provide an overall G&A rate of approximately 15 percent on the contract in suit. The Army audit cited by plaintiff itself so indicates. The testimony of Victory's accountant as to the propriety of a 70 percent G&A rate was sharply disputed by government evidence, and the record discloses no error by the Board in failing to credit plaintiff's tes-

timony or in utilizing the agreed G&A rate.

Upon a careful consideration of all of plaintiff's arguments concerning the drawing changes claim, the Board decision, and the record, it is concluded that the administrative resolution of that claim cannot be overturned.

## II

### *The Inventory Claim*

The contract required that two preproduction samples, assembled using parts, materials and processes to be employed in production and meeting all other contract requirements, be submitted 150 days after contract award (June 27, 1964). It further provided that delivery of production quantities would commence October 26, 1964. Subsequently, however, by Modification No. 4, dated June 30, 1965, and reflecting a revised delivery date (July 22, 1964) for preproduction samples, the first production quantities were scheduled for delivery on September 30, 1965.

In connection with the fabrication of the preproduction samples, Victory was to submit to defendant a TAR containing, among other things, test data pertaining to their performance. Defendant had 10 days to evaluate the test report and, if that report were satisfactory, to establish a date for the start of preproduction sample evaluation. Defendant's evaluation of the preproduction samples was, in any event, to be completed within 60 days.

The Board found that despite the age of the government-furnished drawings, Victory's understanding that they were to be checked for errors and inaccuracies, and its knowledge that changes in them were required, it released some of them to a supplier without doing more than counting them prior to release. The initial release of drawings (for the manufacture of the chassis customarily used to package the operating components) resulted in delivery to Victory, in March

31. During the course of the contract in suit, Victory had about 20 other government contracts, and a considerable dollar volume of commercial business as well.

1964, of chassis which could not be assembled because of incorrect dimensions and mounting holes which did not coincide. Victory then obtained tooling from a company which had previously made the RT–77 and used it to build the chassis for the preproduction samples. The samples were completed in June 1964.

By Action I to TAR 17, dated July 22, 1964, Victory made an initial submission of test data pertaining to the preproduction samples. Additional data omitted from the initial submission was submitted in Action IV, TAR 17, dated November 16, 1964, and still further test data pertaining, the Board found, "to facets other than frequency drift," and in no way "dependent upon the submission of data pertaining to drift" was submitted by letter dated December 7, 1964. In the meantime, a government engineer was sent to Victory's plant on August 17, 1964, to begin preproduction sample evaluation. That evaluation was probably completed about the middle of September 1964; after the "visit" of the government engineer, Victory released production drawings to vendors and mailed out vendor's "contracts."

In the Board's language, in Action VI to TAR 17, dated January 25, 1965, defendant

\* \* \* conditionally approved all test data submitted, with the exception of the data pertaining to frequency stability or frequency drift. Consequently, the preproduction samples were approved with special conditions and [Victory] released for production. These conditions included, among others, a requirement that the permissible limits of frequency drift be established from a random sample of 10 each receiver/transmitter variable capacitors chosen from a cross-section of the first production lot.

Victory was to perform the test mentioned in the foregoing quotation, and to "report these test results to this directorate by subsequent action to this TAR."

No such report of test results was ever submitted. Victory, which had been beset with financial problems throughout the entire period of the contract in suit, was adjudicated a bankrupt in March 1966, and termination of the contract for default followed shortly thereafter.

On May 10, 1966, pursuant to stipulation between counsel for plaintiff and counsel for defendant, defendant took possession of, and removed from Victory's Plainview plant, "contract inventory" which had been identified, inventoried, and itemized in a schedule attached to the stipulation. The government "count" of this property was controverted before, but accepted by, the Board. That "count" is not presently in dispute, but the Board's treatment of the Plainview inventory is.

In 1967, defendant "picked up" from Taffet Electronics, one of Victory's subcontractors, 573 unprocessed shell covers and 1,643 unprocessed shell cases. The Board found that Taffet had received 2,035 shell cases and 2,035 shell covers "for processing and transshipment to \* \* \*" Victory, but accepted the government "count" of the Taffet inventory. Plaintiff does not here question the 1967 "count" *per se*, but does challenge the Board's treatment of the Taffet inventory.

A.   The "All Costs" Aspect of the Inventory Claim

Before the Board, plaintiff contended, among other things, that "a Government-caused delay of five months pending approval of the preproduction models, specifications that imposed requirements impossible of attainment, and additional testing to determine what results were attainable are factors which enter into [Victory's] true cost in producing the inventory", and that these factors should result in a determination that plaintiff was due some $950,000 for the contract inventory.[32]

32. This figure is derived from the application of Victory's accountant's overhead and G & A rates to all of Victory's progress payment requests, and rests on

The Board denied a government motion to dismiss for lack of jurisdiction this aspect of plaintiff's claim (*inter alia*), but rejected plaintiff's contention on the merits, holding that:

> The evidence does not support a finding that the specifications were impossible of attainment and, therefore, does not support a finding that [Victory] expended effort in attempting to meet unattainable requirements. Neither does the evidence demonstrate a delay attributable to the fault of the government.
>
> \* \* \* \* \* \*
>
> The evidence does establish that an additional testing requirement was imposed upon [Victory]. \* \* \* However, \* \* \* the testing was incomplete at the time of default and no data with respect thereto were ever delivered. Therefore, [plaintiff] is not entitled to an equitable adjustment for this requirement.

In this court, plaintiff asserts that the Board erred in denying reimbursement "for all of [Victory's] costs in producing the inventory." [33] It is asserted that this claim is a proper one "for application of the 'total cost' method for measurement of the equitable adjustment which should be included in valuing the inventory", and that the Board's "failure to apply this method was contrary to law." [34] Alternatively, however, plaintiff contends that the Board's valuation of the Plainview and Taffet inventories as "hardware" was unsupported by substantial evidence and legally erroneous.

One of plaintiff's thrusts is that the Board erred in excusing the "Government's six month delay until 25 January 1965 in approving the preproduction models on the ground that Victory did not complete its test data submission until 9 December 1964." [35] The import of

this line of argument is that submission of complete test data was "held up [solely] because of Victory's continued efforts to meet \* \* \* specifications impossible of attainment \* \* \*." [36] As plaintiff advances the contention, it is unsound.

The Board found that Victory failed to submit data unrelated to frequency drift until December 1964. It also found no indication in the record that "submission of these data was in any way dependent upon the submission of data pertaining to drift." These findings are not shown to be unsupported by substantial evidence. Further, while the Board did not explicitly allude to "Radio Interference Suppression" problems [37] in this connection, plaintiff makes no showing that the data included in Victory's December 1964 submission was in any way dependent upon the submission of data pertaining to such problems.

In these circumstances, the Board's conclusion that conditional approval of the preproduction samples on January 25, 1965, was not untimely cannot be deemed to be unsupported by substantial evidence or legally erroneous. *Electronic & Missile Facilities, Inc. v. United States, supra; J. A. Jones Constr. Co. v. United States*, 395 F.2d 783, 184 Ct.Cl. 1 (1968). It is, therefore, final and conclusive here.

Plaintiff's argument that all costs involved in the production of the inventory "were the direct result of the Government's failure to meet its contractual obligations" [38] is sweeping, and insupportable. Without pause for reiteration of the circumstances in which the disfavored "total cost" approach may validly be utilized, it is in any event crystal clear from a careful consideration of the administrative record and plaintiff's arguments that the Board did not err in

---

the theory that all "costs" thus computed "were attributable to the action of the Government \* \* \*." Plaintiff's main brief, p. 56.

33. Plaintiff's main brief, p. 8.

34. *Id.*, p. 55.

35. *Id.*, p. 38.

36. Plaintiff's main brief, p. 16.

37. See p. 19, *infra*.

38. Plaintiff's main brief, p. 42.

refusing to countenance such an approach to the inventory problem in this case. *Cf.* Law v. United States, 195 Ct. Cl. 370 (1971); Boyajian v. United States, *supra.*

Still to be assayed in the light of plaintiff's strenuous challenges to them are, however, other "findings" of the Board.

The Board "found" that the evidence did not establish that "the specifications were impossible of attainment," or that Victory had "engaged in a fruitless attempt to meet a specification impossible of attainment"; it saw no proof of expenditure of effort in attempting to meet unattainable requirements; and concluded that "consequently, no costs were incurred which would here authorize an increase in price." For reasons which follow, the Board thereby erred.

The administrative decision concedes that "It is doubtful that the set as designed could meet the specification limits [as to frequency drift] on band 3." Defendant, with good reason, makes no effort to controvert the concession. Indeed, the administrative record abundantly shows that the quoted sentence is a gross understatement of the actual situation.

Defendant's "team leader" for Victory's RT–77 contract (and Maxwell's, too) admitted that the Band 3 frequency drift requirements were modified in the subsequent Maxwell contract because the RT–77, as designed, was having difficulty meeting specification requirements in this respect. He then testified that without those revisions to the specification requirements, the "drift problem * * just couldn't be met * * *." Not until Action VI to TAR 17, dated January 25, 1965, however, was the "matter of fixing permissible limits for frequency drift * * * deferred * * *." [39]

Moreover, Action VI to TAR 17 also stated that Victory's preproduction sample

* * * was subjected to the Radio Interference Suppression Test * *. The sample has failed to meet the requirements of this specification, however, *because of the extensive redesign * * * to enable the equipment to meet the requirements,* no redesign of the equipment is authorized on this contract. [Emphasis supplied.]

The "team leader" described this part of Action VI as a decision to drop the contractual requirement for the Radio Interference Suppression test because the set as designed could not meet the specification requirements. And, he testified that one of the basic reasons for holding up Victory's preproduction samples until January 25, 1965, was this same, then dropped, test. [40]

■ Accordingly, the Board's "findings" that the evidence failed to establish that the specifications were impossible of attainment, and "therefore" did not show that effort had been expended in attempting to meet unattainable requirements, are "arbitrary and unsupported by substantial evidence." United Contractors v. United States, 368 F.2d 585, 601–602, 177 Ct.Cl. 151, 172–173 (1966). Plaintiff is entitled to be paid "the increased costs and expenses which [Victory] incurred in attempting to comply with" such requirements. Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 872, 181 Ct.Cl. 607, 634 (1967); Hol-Gar Mfg. Co. v. United States, 360 F.2d 634, 175 Ct.Cl. 518 (1966).

■ Defendant's effort to distinguish *Hol-Gar,* and other cases applying that holding, fails. Its argument that the "findings" of the Board are supported by substantial evidence overlooks the contents of the administrative record. Its implication that the absence of any written request to the contracting officer for an equitable adjustment based upon a constructive change somehow bars relief here is, in the circumstances of this case, manifestly untenable. *Cf.* Whittaker

39. Defendant's main brief, p. 27, n. 12.

40. It should perhaps be noted that the "team leader's" testimony concerning "un-

attainable requirements" was uncontradicted in, and indeed was corroborated by, the remainder of the record.

Corp. v. United States, 443 F.2d 1373, 195 Ct.Cl. 161 (1971). Finally, its observation that the Board considered and denied on the merits "this aspect of plaintiff's claim" [41] is an accurate one, but that denial is, for reasons stated, of no avail to defendant.

The Board's treatment of the additional testing requirement admittedly imposed upon Victory by Action VI to TAR 17 must also be reversed.

■ The Board noted that by Action VI to TAR 17, Victory was required to conduct a testing program to establish data to fix the permissible limits of frequency drift acceptable in production units to be delivered, and that this testing was "incomplete at the time of default." It denied recovery for Victory's efforts toward compliance with the additional testing requirement, however, on the stated ground that "the testing was *incomplete* at the time of default and no data with respect thereto were ever delivered." (Emphasis supplied). This holding is erroneous as a matter of law.

The Board's opinion is consistent only with the conclusion that defendant had imposed, and the finding that Victory had partially complied with, a new contractual requirement. An equitable adjustment for the "actual change" thus effected is not to be entirely denied simply because the new obligation had not been fully performed at contract termination.[42]

In sum, the stated bases for the Board's denial of an equitable adjustment for what it recognized as an allegation of "impossibility of performance amounting to a constructive change", and for "additional testing requirements", are defective under Wunderlich Act criteria, and are, therefore reversed. The question of the equitable adjustment due plaintiff for the "constructive" and "actual" changes must, however, be deferred; further administrative proceedings on that question are required. United States v. Anthony Grace & Sons, 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966); United States v. Utah Constr. & Mining Co., 384 U.S. 394, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); Maxwell Dynamometer Co. v. United States, *supra.*

B. The "Hardware" Aspect of the Inventory Claim

Having concluded that plaintiff was not entitled to an equitable adjustment because of governmental delays or changes, the Board determined that the value of Victory's contract inventory taken by defendant subsequent to default termination was $258,639.08. In reaching that composite sum for inventory at Victory's Plainview plant, at Miles, and at Taffet, the Board necessarily resolved a number of conflicts as to both "count" and value.

1. The Plainview Inventory

The government evaluation of this inventory was $172,868. Plaintiff claimed administratively that, even computed on the basis of the government "count" the fair and reasonable value of the Plainview inventory was $258,497.26. The difference between the two claimed values, the Board said, was "found partly in costs associated with labor, G&A and overhead applied to tasks of converting components into assemblies." The Board concluded that such costs should be considered in valuing the inventory taken, and stated that "we do so consider them here." The Board opinion then states that:

> * * * Although [plaintiff] should be allowed a part of the difference between the Government valuation of the Plainview inventory and [plaintiff's valuation] * * * upon all the evidence [plaintiff] is not entitled to the entire amount of that difference. We believe a reduction of 20% applied to [plaintiff's] figure to be appropriate and, accordingly, for the inventory taken at Plainview we allow the sum

---

41. Defendant's main brief, pp. 30–31.

42. The government brief to the Board recognized a testing requirement "not part of the contract," and asserted that a "total of $2,998.60 was considered equitable for all such testing * * *."

of $206,798.81. This sum includes $400 for each of nine sets [not assembled at the time the inventory was taken, and therefore not completed supplies to be valued at the contract unit price of $464.99]; the inclusion of some labor and overhead in the valuation of completed assemblies, and a reduction from the actual cost of purchased components when they are subsequently priced as miscellaneous manufacturing materials of undetermined condition, or as surplus hardware of undetermined market value.

Plaintiff contends that each of the grounds cited by the Board in support of the 20 percent reduction of the amount claimed for the Plainview inventory is "without merit and the finding based thereon is contrary to law." [43]

Specifically, plaintiff first asserts that the disassembled state of the nine sets was attributable to the additional testing requirement imposed by Action VI to TAR 17, and that the Board's failure to allow the contract unit price is therefore legally erroneous. While the Board did find that this "testing was incomplete at the time of default", the precise reason for the state of the sets at time of inventory was not made the subject of a finding, and defendant alleges an absence of evidence that that state was attributable to compliance with Action VI to TAR 17.

It seems neither necessary nor desirable presently to explore this treacherous area. Cf. Whittaker Corp. v. United States, supra. Further administrative proceedings relating to the testing requirement are in any event required; in such proceedings, the Board should make sufficient findings of fact from which to determine whether or not its allowance for the nine complete but not assembled sets needs revision. If so, the Board should also specify the extent of that revision.

Plaintiff also forcefully (and with some plausibility) attacks the other factors which led to the Board's reduction; defendant as forcefully cries "jury verdict." See Phillips Constr. Co., Inc. v. United States, supra. The fact of the matter is that in its present state the Board opinion on the reduction is so elusive as to render a review under applicable standards little more than a guess, if not an outright gamble.[44] Moreover, the result reached in Part II A, supra, conceivably could affect the Board's Plainview hardware evaluation.

In these circumstances, and in view of the necessity for further administrative proceedings directed to other issues, the fairest and most reasonable course is to pretermit decision on the propriety of the Plainview inventory reduction in its entirety, in order that the Board may have an opportunity to spell out, if it chooses, the rationale of the Plainview inventory valuation, and, if it chooses, to revise it. If this does not lead to a satisfactory administrative disposition of the issue, it will then at least facilitate a reasoned decision respecting it.

2. The Taffet inventory

The Board found that 2,035 shell covers, and 2,035 shell cases, had been shipped to Taffet, at Victory's instance, for processing and transshipment to Victory; that in 1967, at Taffet, defendant "took possession of 573 unprocessed shell covers and 1,643 unprocessed shell cases"; that, in June 1966, when defendant's representatives "first attempted to take possession of the inventory at Taffet * * * they saw what purported to be work in process belonging to [Victory] which was not seen or picked up in 1967 * * * "; that neither the nature of the work in process, its extent, nor its disposition had been established; and that

43. Plaintiff's main brief, p. 59.

44. E. g., after ostensibly deciding to consider "labor, G & A and overhead" as "factors to which some weight should be given", the Board included "some labor and overhead in the valuation of completed assemblies". It also effected "a reduction" from "actual cost" of some components of exceeding vagueness.

Taffet was performing for Victory "work * * * in panels and sheet metal which was not related to the processing of the cases and covers."

Noting the testimony of Taffet's president that the difference between the number of covers and cases shipped to Taffet and the number "picked up by the Government [in 1967] represents those cases and covers which were processed and shipped to [Victory]", the Board stated that "We accept the count of the Government * * *." It allowed therefor a total of $10,516.84.[45]

Plaintiff, in substance reiterating the argument also made to the Board, asserts that by virtue of the contract Progress Payments clause, defendant "had title to this material * * * when the bankruptcy occurred", and in June 1966 "accepted and took delivery of such material".[46] Thus, plaintiff contends, defendant "was thereafter responsible for the fate of such inventory." [47] A January 1967 government memorandum which quotes Taffet's president as saying that Victory materials were then being shipped by Taffet to another government contractor producing the RT–77 is stressed. The import of all this, plaintiff urges, is that the fair value of "partially processed cases and covers" at Taffet in June 1966 was considerably more than the Board allowed.[48]

Plaintiff's contention that defendant took possession of the Taffet inventory in June 1966, and thereafter was responsible for any loss, need not be reached. While the Board opinion suggests an implicit rejection of plaintiff's position, it in any event suffices presently to hold that plaintiff has failed to establish that the Board's "count" was in any way arbitrary, capricious, unsupported by substantial evidence, or legally erroneous.[49] Accordingly, the administrative determinations, both of quantities and values, of the Taffet inventory are here binding.

III

*Defendant's Motions (A) to Dismiss Count I and (B) for Judgment on its Counterclaim*

A

Defendant observes that Count I of the amended petition, while purporting to assert a claim for breach of contract, "is for the identical relief and is based upon the identical basic facts as those alleged in Count II." [50] Relying upon La Crosse Garment Mfg. Co. v. United States, 432 F.2d 1377, 193 Ct.Cl. 168 (1970); Marley v. United States, 423 F.2d 324, 191 Ct.Cl. 205 (1970), and other decisions of this court, defendant contends that complete redress for the claims pleaded in Count I was available administratively, and that the claims may not, therefore, be converted by redescription into breach claims to be tried *de novo*. In consequence, defendant concludes, "plaintiff's

---

45. This sum resulted from application, to defendant's "count", of the cost set forth in the purchase order under which the contract materials had been shipped to Taffet. The Board discounted evidence of some $29,000 in progress payments by Victory to Taffet, and Taffet's proof of claim in bankruptcy (some $57,000), apparently on the ground that Taffet was performing for Victory work, of "indiscernible extent and disposition", "unrelated to the modification of shells and cases."

46. Plaintiff's main brief, pp. 61–62.

47. Plaintiff's reply brief, p. 20.

48. Plaintiff's main brief, pp. 63–64.

49. Plaintiff admits a failure to prove how many of the processed materials covered by Victory progress payments to Taffet had been delivered to Victory prior to bankruptcy and how many were still at Taffet in June 1966. Moreover, interestingly, if strangely, the January 1967 memorandum cited by plaintiff as showing a post-June 1966 diversion of Victory materials to another government contractor also shows that prior to Victory's bankruptcy Taffet had received from Victory 1,643 cases and 573 covers, the precise quantities "picked up" later in 1967. There is evidence that the cases and covers "picked up" were not those originally shipped to Taffet as Victory materials, but were "exactly similar" to them.

50. Defendant's main brief, p. 46.

first cause of action no longer exists", and Count I must accordingly be dismissed.[51]

Plaintiff's reply brief is not really responsive to this argument; it asserts only that since no motion is pending with respect to Count I, no purpose would be served by discussion of this contention. Plaintiff errs. Defendant's cross-motion for summary judgment incorporates a plea that Count I be dismissed. That plea must be, and is, granted. Northbridge Electronics, Inc. v. United States, *supra;* Briscoe v. United States, 442 F.2d 953, 194 Ct.Cl. 866 (1971).

■■■ Despite an unappealed default termination, plaintiff sought and received "full [administrative] consideration of a subsequent dispute resulting from the inability of the parties to agree upon the payment due when the Government following * * * default, elect[ed] to take possession of finished items and manufacturing materials." The Board, "considering plaintiff's claims to be within its competence, entertained them all and made such awards as it deemed warranted by the evidence." *Northbridge Electronics, Inc. v. United States, supra.* No reason for here escaping the force of the "administratively redressable" rule is suggested by plaintiff, and, in the circumstances, none appears. *Cf.* National Steel & Shipbuilding Co. v. United States, 419 F.2d 863, 190 Ct.Cl. 247 (1969); Jefferson Constr. Co. v. United States, 368 F.2d 247, 177 Ct.Cl. 581 (1966).

B

Defendant's motion for judgment on its counterclaim must, however, be denied. It is clear, and both parties recognize, that the validity of the counterclaim depends entirely on the resolution of plaintiff's claims. Since, as hereinabove held, further administrative proceedings are necessary to such a resolution, defendant's motion for judgment in its favor on its counterclaim is presently premature, and the said motion is accordingly denied without prejudice.

IV

*Conclusion*

For the foregoing reasons, it is concluded that plaintiff's motion for summary judgment on Count II of the amended petition is granted, to the extent hereinabove indicated, but otherwise denied; that defendant's cross-motion for summary judgment on Count II is granted, to the extent hereinabove indicated, but otherwise denied; that defendant's motion for judgment in its favor on its counterclaim is denied; that defendant's motion to dismiss Count I of the amended petition is granted and Count I is dismissed; and that further proceedings herein are stayed for a period of 6 months pursuant to (and subject to the terms of) Rule 167 to afford the parties an opportunity to obtain an administrative resolution of the amount of the equitable adjustment to which plaintiff is entitled.